**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AIR FLOW SHEET METAL, INC., and Local Union No. 156, Sheet Metal Workers' International Association, AFL–CIO, Respondents.**

No. 16522.

United States Court of Appeals Seventh Circuit.

May 20, 1968.

Marcel Mallet-Prevost, Asst. General Counsel, William H. Carder, Attorney, N.L.R.B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Nancy M. Sherman, Attorney, N.L.R.B., for petitioner.

Max E. Hobbs, Larry T. Miller, Frank A. Higgins, Fort Wayne, Ind., Dale,

Duemling & Miller, Fort Wayne, Ind., of counsel, for respondent Air Flow Sheet Metal, Inc.

Before CASTLE, KILEY and CUMMINGS, Circuit Judges.

KILEY, Circuit Judge.

The National Labor Relations Board found that respondent Union[1] violated Secs. 8(b) (2) and (1) (A) of the National Labor Relations Act by causing Air Flow Sheet Metal, Inc., to discharge its employee Milligan for a reason other than non-payment of dues or initiation fees; and that Air Flow violated Secs. 8(a) (3) and (1) of the Act by discharging Milligan. The Board ordered, *inter alia,* that the Union cease and desist from its unlawful conduct and that Air Flow offer Milligan reemployment and make him whole for loss of pay. We agree with the Board that its order should be enforced.

Air Flow, of Fort Wayne, Indiana, is in the business of installing sheet metal products in building construction. As a member of a contractor's association, it is party to a collective bargaining agreement with the Union. The security clause of the agreement requires as a condition of employment that an employee join the Union within eight days after employment.

Milligan was employed by Air Flow on September 1, 1965, and began work in Kokomo, Indiana. He applied for Union membership about September 15 and made a down payment on the initiation fee. On November 1 he was transferred to "the RCA job" at Marion, Indiana. On January 19, 1966, he was transferred to "the Corning Glass Works job" at Bluffton, Indiana. His work on behalf of Air Flow terminated "on or about" January 20, 1966, and four days later he filed the unfair labor practice charges in this record.

The complaint alleges that the Union "on or about January 19 and 20, 1966," caused Air Flow to Discharge Milligan at Air Flow's Marion and Bluffton, Indiana, job sites and that the Union continues to prevent Air Flow from reinstating Milligan in his job. It is further alleged that the Union's conduct was based on Milligan's non-membership in the Union, his criticism of the Union, his failure to take a Union examination and his failure to obtain Union clearance for his employment. Air Flow and the Union denied substantially all the charges.

The Board adopted, in substance, the decision[2] and recommendation of the Trial Examiner, in entering the order. The Examiner found that the Union caused Air Flow to discharge Milligan because he was not a Union member, and had not taken and passed an examination for journeymen sheet metal workers.

The issues raised by the Union and Air Flow are: whether the record supports the finding that there was a discharge; whether, if there was a discharge, it was for good cause; whether in suspending Milligan on January 20, 1966, the Union was within its right to enforce its Union rules; whether the Examiner's credibility findings, favoring Milligan, are justified on the record; and whether the Union and Air Flow were denied a fair hearing because of the Examiner's conduct.

The respondents contend they were denied a fair adversary hearing because the Examiner assumed the role of Board advocate. We have read the Trial Examiner's questioning of General Counsel witnesses Ehrman, Krock and Milligan, and of respondents' witnesses Quarles, Shaw and Ehrman. We think that the Trial Examiner went beyond his function of Examiner in certain instances by

---

1. Local No. 156, Sheet Metal Workers' International Association, AFL–CIO.

2. The Board did not adopt the Examiner's findings with respect to violations in the January 19 transfer of Milligan or in the denial of Union membership and reinstatement in employment because of his filing of charges with the Board. The reason is that these "violations" were neither charged in the complaint nor presented at the hearing.

taking over the questioning of witnesses of both parties.

■ An examiner is not required to assume a wholly passive role and should participate in the proceeding whenever necessary to the end that the hearing proceed in an orderly, expeditious fashion. On the other hand, he should permit the attorneys for the parties to question the witnesses in their own way to develop their own cases. We do not find, as the court did in Tele-Trip Co. v. NLRB, 4 Cir., 340 F.2d 575, that the Examiner's questioning was "argumentative" or displayed "a critical approach, obvious disbelief," or an attitude "closely bordering on partisanship or even hostility." The court in Tele-Trip, although it did make the above findings and although it was highly critical of the examiner, p. 581, did not order a new hearing.

■ The record here merely shows an impatience on the Examiner's part to allow the attorneys to evoke the testimony their own way. We disapprove, because we think this practice if approved might lead to implications of partiality and might lessen respect for the administrative process under the NLRA. We conclude, however, that the Examiner's conduct here did not deny respondents a fair hearing, and did not lead to a distorted result.

■ We see no merit in the contention of respondents that the Examiner contributed to an unfair hearing because he permitted testimony outside the issues. The Examiner did make findings, not adopted by the Board, with respect to violations which had not been put in issue by the unfair labor practice charges. The testimony which related to these findings was introduced by respondents, as well as the General Counsel, and related to events the day before the January 20 discharge as well as events subsequent to the discharge. The testimony is not unrelated to the charges actually made since the allegation of the charge was that the discharge took place on or about January 19 and 20 and since the testimony was relevant to the issue of the employer's reason for discharging Milligan. We cannot find any prejudice to respondents because of the testimony on which the findings of additional violations were based.

■ We hold the testimony amply supports the Board's conclusion that the Union violated Secs. 8(b) (1) (A) and 8(b) (2)[3] by causing Air Flow to discharge Milligan because he had not taken the Union examination; and that Air Flow violated 8(a) (1) and (3) by discharging Milligan and refusing to reinstate him for reasons other than non-payment of initation fees and dues.

The Examiner could, with substantial support find the following: Union Steward Beatty at a Union meeting January 17 reported that Milligan had stated to Union members on the RCA job that he did not have to, and would not, join the Union; that Union business agent Krock was informed the men would walk off the job unless the matter was straightened out and that Krock promised to go to the RCA job and straighten "it" out. On the morning of January 19, 1966, Krock and Beatty and Air Flow's Project Manager Thomas and Superintendent Quarles met with Milligan. Thomas and Quarles heard Krock tell Milligan he could not work until he took the Union examination. Krock "suggested" Thomas and Quarles lay Milligan off until he took the examination. Thomas and Quarles, faced with a "slow down" on the job because of Milligan's Union trouble, readily accepted the suggestion and told Milligan he had to be laid off. He was paid up to the end of the day.

---

3. (b) It shall be an unfair labor practice for a labor organization or its agents—
 * * * * *
 (2) * * * to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;
* * *

Milligan then reported what happened to Ehrman, Air Flow's Operations Manager. An hour later Ehrman told him he had not been "fired," but had been transferred and to report the next morning at the Bluffton Corning Glass job. He reported January 20 to Shaw, superintendent of Air Flow's subcontractor, who directed the sheet metal workers at Bluffton. Krock came to the job in the morning, told Milligan in Shaw's presence that he had been suspended by the Union and could not work until he had taken the examination and been admitted to membership in the Union. Shaw told Milligan he could not work in view of the suspension. Milligan told Shaw to inform Ehrman of what happened and to say Milligan was on his way to get his check. When Milligan arrived at Ehrman's office, his check had been prepared. Ehrman told him he could return to work when he had straightened out his trouble with the Union.

It is true that under the Union security clause Milligan was required to be a member of the Union for continued employment. But Milligan's Sec. 7 rights and the restraints upon the Union in 8(b) (2) and upon Air Flow in 8(a) (3) are as much a part of the bargaining agreement as if they had been expressly stated. The Union could not cause the discharge of Milligan for non-membership in the Union unless he had failed to tender his initiation fee and dues, nor could Air Flow discharge him for non-membership if it knew, or should reasonably have known, that he was being denied membership for not taking an examination.

Respondent argues that if Milligan was fired it was for causing disturbances among the other men, and not for failure to take the Union examination. While it is probably true that Milligan was an abrasive element on the job, the Board could well infer that when Milligan was told by Thomas that Air Flow would have to "let him go," it was not because of unsatisfactory performance but because of Milligan's Union trouble and its effect on the work progress. Milligan

had been on the RCA job for more than two months and there is no evidence that Thomas and Quarles had thought, before January 19, of discharging Milligan for unsatisfactory work or causing dissension. Moreover, Shaw's statement on the 20th that Milligan could not work with a Union suspension and Ehrman's statement on the 20th that Milligan could return to work after he was straightened out with the Union leave no doubt about the reason for Milligan's discharge on January 20.

We conclude that Milligan's discharge was not justified here, as was that of Gonzalez in NLRB v. V. C. Britton Co., 9 Cir., 352 F.2d 797, 799; and he did not voluntarily leave his job, as Ram did in NLRB v. Brown, 9 Cir., 310 F.2d 539, 546, 547.

What the Sixth Circuit said in NLRB v. Leece-Neville Co., 330 F.2d 242, about burdening the employer with the duty of investigating whether dues had been paid is not pertinent here, since there is substantial support in the record for the conclusion that the Company knew the reason for Milligan's Union trouble was not failure to pay dues or fees. Moreover, there was no conflicting evidence before the employer as to the reason why the Union sought Milligan's discharge as there was in the *Leece-Neville* case.

 There is no merit in arguments that we should decide that Milligan was not discharged because he could not testify the word "fired" was used. The claim that he "quit" work on either day is ridiculous on this record. Nor is there merit in the claim that he was not believable because he is a "convicted liar" or because of his "record" of arrests, convictions and imprisonment.

We think the testimony for Air Flow carries its own weaknesses because of the conflict between the testimony of Krock, and that of Thomas and Quarles, with regard to what transpired at the January 19 meeting with Milligan; because of the incredibility of Shaw's testimony that he was present, but did not hear, what Krock said to Milligan on January 20;

**510**

and because of the incredibility of the testimony of Ehrman that he had Milligan's check prepared in advance on January 20 for the reason that he had decided the day before to fire Milligan for reasons not related to the Union.

No case cited justifies our setting aside the Board's credibility determinations on the record before us. We accept the credibility findings of the Examiner, adopted by the Board, as substantially supported by the record.

The order will be enforced.