William M. DAVIS, d. b. a.
G.S.R. Landfill

v.

W. Edward WOOD, Director of Depart-
ment of Environment Management.

No. 80–272–M.P.

Supreme Court of ·Rhode Island.

March 27, 1981.

Leonard A. Kiernan, Jr., Thomas C. Plunkett, Providence, for plaintiff-respondent.

Sean O. Coffey, Chief Legal Counsel, Dept. of Environmental Management, Providence, for defendant-petitioner.

Daniel J. Schatz, Sp. Asst. Atty. Gen., for Atty. Gen., as amicus curiae.

## OPINION

KELLEHER, Justice.

This is a statutory petition for certiorari which we issued pursuant to the relevant provisions of the Administrative Procedures Act (APA), to wit, G.L.1956 (1977 Reenactment) § 42–35–16, at the behest of the Director of the Department of Environmental Management (DEM). He seeks a review of a judgment entered in the Superior Court in which the trial justice ruled (1) that the provision of G.L.1956 (1979 Reenactment) § 23–18.9–8 which authorized the director's licensing of solid-waste-management facilities is unconstitutional because the statute represents an unconstitutional delegation of legislative power and (2) that the administrative hearing conducted within the DEM did not measure up to the fairness requirements of due process.

The record certified to us indicates that in the fall of 1977, respondent, William M. Davis (Davis), operated a licensed solid-waste-management facility in the Glocester-Smithfield area of the state. On September 22, 1977, he applied for a renewal of his license. In the meantime, DEM personnel were conducting periodic inspections of Davis's facility to determine his compliance with DEM rules and regulations. These inspections revealed violations of departmental rules.

Davis was first notified of these violations on November 4, 1977. The notice informed Davis that his license, due to expire on December 8, 1977, would not be renewed until the matters amounting to violations were remedied. Later, on January 9, 1978, he was informed of further violations. During this period he took no steps to avail himself of an opportunity to request a hearing so that he could show cause why the violation orders should not remain in effect.

On January 19, 1978, DEM denied Davis's application for a renewal of his license. At that time Davis availed himself of the opportunity to request a hearing on these matters. At the hearing, testimony of DEM personnel indicated that their inspections revealed violations of departmental rules concerning the covering and separation of refuse and equipment required to be present at such a facility. On December 18, 1978, DEM affirmed the denial of Davis's application for renewal, and he was ordered to submit within three weeks complete plans for a systematic termination of the facility's operation. He then turned to the Superior Court, seeking judicial review in that tribunal by way of the APA, to wit, G.L.1956 (1977 Reenactment) § 42–35–15.

We shall first consider the delegation question and then go on to discuss the due-process issue.

In order to appraise the constitutionality of the DEM licensing statute, G.L.1956 (1977 Reenactment) § 23–18.9–8, we must first give a brief review of Rhode Island legislative efforts in the regulation of the disposal of solid waste. The General Assembly at its January 1968 session made its original attempt to deal with the problem of refuse disposal with the passage of P.L. 1968, ch. 192. This legislation gave the Department of Health (DOH) the authority to regulate "refuse disposal facilities." The act also added chapter 46 to title 23. This chapter, entitled "Refuse Disposal," made it clear that each municipality had the responsibility of disposing of refuse generated within the municipality, but it also recognized that in some instances a regional approach should be made to the issue. The Legislature expressed a concern that the disposal of "specialized waste" might present a threat to the public health which, in turn, would require the assistance of the DOH; and the DOH was authorized in such instances to "request that the [G]overnor recommend appropriate action to the [G]eneral [A]ssembly."

However, as we observed in *Town of Glocester v. Rhode Island Solid Waste Management Corp.*, R.I., 390 A.2d 348, 349

(1978), many cities and towns, having been assigned by the state responsibility for the safe and sanitary disposal of refuse generated within their respective communities, were hard pressed to provide adequate service at reasonable cost, and others, as a result of inefficient practices and poor management techniques, were confronted with pollution problems, environmental deterioration, and the unnecessary waste of land and other valuable resources. In response to these developments, the Legislature in 1974 with the enactment of P.L.1974, ch. 176, substantially amended the 1968 legislation and simultaneously enacted chapter 46.1 of title 23, the Rhode Island Solid Waste Management Corporation Act (the waste-management act).

The waste-management act, with its accompanying legislative findings and policy declaration, recognized that the collection, disposal, and utilization of solid-waste matter were matters of general concern to the citizens of this state and their welfare; that the problems associated therewith were statewide in scope; that appropriate governmental processes and support were required so that an effective and integrated statewide network of solid-waste-management facilities might be planned, financed, developed, and operated in an environmentally sound manner for the benefit of the people in the municipalities of the state; and that private industry should be encouraged to continue to play a key role in the state's solid-waste-management program.

In amending the 1968 legislation, the Legislature specified that no person could operate a solid-waste-management facility unless a license therefor had been obtained from DOH's director, who was given "full power to make all rules and regulations establishing standards" that must be complied with before any license could issue. General Laws 1956 (1968 Reenactment) § 23–46–8.

After a lapse of three years, the Legislature, at its January 1977 session, again manifested concern about environmental affairs when it gave favorable consideration to an act that enlarged and reorganized the Department of Natural Resources and changed its name to the Department of Environmental Management. Public Laws 1977, ch. 182. Among the powers and duties transferred to the new department and its director were those formerly exercised by the DOH and its director pursuant to chapter 46 of title 23. Section 42–17.1–2(e) (1980 Cum.Supp.).

When the trial justice was considering the director's licensing and rule-making power, he focused his attention on G.L.1956 (1979 Reenactment) § 23–18.9–8, which, because of the assignment of statutes necessitated by the reenactment in 1979 [1] of titles 22 through 28 of the General Laws, replaced § 23–46–8, which had originally authorized the licensure of solid-waste-management facilities by the director of health. The trial justice, after noting that § 23–18.-9–8 was identical to the former § 23–46–8, went on to say that the power bestowed on the director by this proviso was "broad and sweeping." He also remarked that the General Assembly "had failed to provide any standard" that would prescribe the director's licensing and rule-making power. Unfortunately for the trial justice, the standards that he found absent were present. They were present when the General Assembly first gave the licensing and rule-making power to the director of health in 1974; and, as will be seen, they were transferred to the DEM's director in 1977.

The nondelegation doctrine in Rhode Island stems from the Rhode Island Constitution, art. IV, §§ 1 and 2, which provide that the Rhode Island Constitution shall be the supreme law of the state and that the legislative power thereunder shall be vested in the two houses of the Legislature. The purpose of the nondelegation doctrine is to protect the citizens against arbitrary and discriminatory action by public officials. As a practical matter, the doctrine has not prohibited the delegation of legislative power. Since we recognize the need of a legislative body to employ an

---

1. *See* P.L.1979, ch. 39.

administrative agent to effectuate the beneficial purposes of legislation, the delegation will be upheld if the statute declares a legislative purpose, establishes a primary standard for carrying out the use, or lays out an intelligent principle to which an administrative officer or body must conform. As long as the Legislature that creates the agency demonstrates standards or principles to confine and guide the agency's power, this court will sustain the delegation. *See First Republic Corp. of America v. Norberg,* 116 R.I. 414, 358 A.2d 38 (1976); *J. M. Mills, Inc. v. Murphy,* 116 R.I. 54, 352 A.2d 661 (1976).

In determining whether a statute contains sufficient standards, we must read the act as a whole; the provision in question should not be isolated, but must be construed with reference to the entire act. *United States v. Gordon,* 580 F.2d 827, 839 (5th Cir. 1978); *Sheeran v. Nationwide Mutual Insurance Co.,* 80 N.J. 548, 558, 404 A.2d 625, 630 (1979); *see Narragansett Electric Co. v. Harsch,* 117 R.I. 395, 402, 368 A.2d 1194, 1199 (1977).

The relevant standards in the case at bar were first set forth in P.L.1974, ch. 176, § 1, where, in enacting chapter 46.1 of title 23, the General Assembly recognized that "[i]nefficient practices and poor management techniques result in pollution problems and environmental deterioration and result in a waste of land and other valuable resources" and declared it to be the policy of the state that "solid waste management activities be conducted in an environmentally sound manner."

In the *Mills* case, we were concerned with the nondelegation doctrine as it concerned legislation to preserve the wetlands. There we ruled that a legislative declaration that protection of the wetlands was "in the best public interest" set the acceptable guide that would regulate the Department of Natural Resources's activities in its administration of the "Fresh Water Wetlands Act." In like vein, we believe that the Legislature's 1974 directive that activities relating to the management of solid waste be conducted "in an environmentally sound manner" creates a sufficiently intelligible standard by which the DEM must function within this specific area of its responsibilities.

In taking this position, we specifically reject Davis's contention that the 1974 legislative findings and declarations of policy which are now set forth in G.L.1956 (1979 Reenactment) §§ 23–19–2 and 23–19–3 apply only to the activities of the Solid Waste Management Corporation. No court will ever impute to the Legislature an intent to enact statutes devoid of logic or reason or one that achieves unreasonable consequences. *Town of Scituate v. O'Rourke,* 103 R.I. 499, 513, 239 A.2d 176, 184 (1968). The "solid waste" that the corporation might handle is almost identical by definition to the "solid waste" that would enter the facilities licensed by the director. Davis apparently wants us to believe that the corporation's solid waste would be handled in an environmentally sound manner, while the department's licensees could dispose of their waste in any manner they see fit. We cannot subscribe to such an argument. The "environmentally sound" standard, in our opinion, applies to all who seek to dispose of solid waste within the confines of Rhode Island.

Davis's due-process argument arose because the trial justice faulted R. Daniel Prentiss, the hearing officer at the administrative level, for his conduct as the hearing officer and his subsequent appearance as counsel for the DEM on appeal in the Superior Court. The trial justice ruled that at the administrative hearing Prentiss seemed to be fully aware of the agency's case because he had asked the DEM's attorney whether certain testimony was going to be introduced. We find this awareness is no ground for finding that Prentiss was biased at the time of the revocation hearing.

Certainly, a fair trial in a fair tribunal is a basic requirement of due process. *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, 946 (1955). This requirement is as applicable to administrative agencies as it is to the courts.

*Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *La Petite Auberge, Inc. v. Rhode Island Commission For Human Rights*, R.I., 419 A.2d 274 (1980).

■ However, the United States Supreme Court has held that mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of administrative board members at a later adversary hearing. *Withrow v. Larkin*, 421 U.S. at 55, 95 S.Ct. at 1468, 43 L.Ed.2d at 728. Agency officials are presumed to be capable of judging a particular controversy fairly on the basis of its own circumstances. *Central Arkansas Auction Sale, Inc. v. Bergland*, 570 F.2d 724, 731 (8th Cir. 1978). Therefore, the fact that Prentiss was *aware* of the DEM's case, without more, does not show bias.

■ Although a combination of investigatory and judicial functions is not always prohibited, a combination of *prosecutorial* and judicial functions in the same individual is condemned. When the *same individual* who investigates and prosecutes the case before an administrative agency then becomes a factfinder in the same proceeding, the adjudicatory stage of the proceeding has been unconstitutionally tainted. *Gashgai v. Board of Registration In Medicine*, 390 A.2d 1080, 1082 n. 1 (Me.1978); *Bruteyn v. State Dental Council & Examining Board*, 32 Pa.Cmwlth. 541, 380 A.2d 497, 501 (1977). Thus, it has been held that a member of a commission should have disqualified himself from participating in the commission decision because he had *previously* participated in the case as counsel. *American General Insurance Co. v. FTC*, 589 F.2d 462 (9th Cir. 1979); *Bruteyn v. State Dental Council & Examining Board*, 32 Pa.Cmwlth. 541, 380 A.2d 497 (1977). We note that these cases focus on the actual *prior* involvement by the hearing officer in the case he is now deciding. *Grolier, Inc. v. FTC*, 615 F.2d 1215, 1221 (9th Cir. 1980). This finding is based upon the fact that one who has buried himself in one side of an issue is disabled from later judging that issue in a dispassionate manner. Davis, *Administrative Law Text* § 13.01 at 255 (3d ed. 1972).

■ In the case at bar, Prentiss did not serve in a prosecutorial capacity *prior* to his decision at the hearing. His *subsequent* appearance in Superior Court as an adversary does not prove his bias at the earlier hearing. *See ITT Corp. v. Electrical Workers*, 419 U.S. 428, 448 n. 18, 95 S.Ct. 600, 612 n. 18, 42 L.Ed.2d 558, 573 n. 18 (1975).

■ Similarly, we find that no bias is shown by the limited questioning conducted by Prentiss at the administrative hearing. In the course of that hearing, Prentiss asked DEM's attorney whether certain testimony was forthcoming and questioned a witness. The trial justice found that Prentiss was "assisting" DEM.

An administrative hearing officer is not required to assume a wholly passive role and may participate in the proceeding whenever necessary to the end that the hearing proceed in an orderly, expeditious fashion. He is free to interrupt witnesses and should do so on those occasions when it is necessary to seek a clarification of the testimony. But a hearing officer must be impartial and must not attempt to establish proof to support the position of any party to the controversy. Once he does so, he becomes an advocate or participant, thus ceasing to function as an impartial trier of fact. Such a transformation gives rise to a lack of the fundamental fairness required by due process. *NLRB v. Air Flow Sheet Metal, Inc.*, 396 F.2d 506, 508 (7th Cir. 1968); *Tele-Trip Co. v. NLRB*, 340 F.2d 575, 581 (4th Cir. 1965); *see Blizard v. Frechette*, 601 F.2d 1217, 1222 (1st Cir. 1979).

It is our belief that Mr. Prentiss's questioning and reference to forthcoming testimony demonstrates an attempt at clarification of the testimony rather than partisanship to DEM. Accordingly, we find no violation of Davis's due-process right.

The petition for certiorari is granted, the judgment entered in the Superior Court is quashed, and the papers are remanded to the Superior Court for further consideration of Davis's appeal from the denial of his renewal application.

SHEA, J., did not participate.