**Edward D. DiPRETE**

v.

**Richard W. MORSILLI et al.**

No. 92–433–M.P.

Supreme Court of Rhode Island.

Jan. 11, 1994.

Joseph A. Kelly, Keith Kyle, Carroll, Kelly & Murphy, John R. Mahoney, Baluch, Mahoney & Gianfrancesco, Providence, for plaintiff.

Gary Yesser, Ethics Comm'n, Providence, for defendant.

## OPINION

MURRAY, Justice.

This matter is before this court pursuant to a petition for certiorari. The petitioner,

Edward D. DiPrete (DiPrete), filed this petition, seeking review of a Superior Court judgment affirming the findings of the Rhode Island Ethics Commission (commission). The commission found that DiPrete had violated certain provisions of the Code of Ethics, G.L.1956 (1984 Reenactment) chapter 14 of title 36, as enacted by P.L.1987, ch. 195, § 3, in awarding two state contracts.[1]

In November of 1984 DiPrete was elected Governor of the State of Rhode Island. He was subsequently reelected in the general elections held in 1986 and 1988. In January 1989 Common Cause of Rhode Island filed a complaint with the commission, alleging that DiPrete had violated certain provisions of the state's ethics laws by improperly utilizing his position as Governor to obtain state contracts for relatives, friends, or business associates. The commission conducted a preliminary investigation into the complaint and found that sufficient evidence existed to support allegations surrounding two specific incidents, one concerning the selection of legal counsel for litigation involving the construction of the Jamestown Bridge and the other regarding the selection of an engineering firm for a project at Olney Pond in Lincoln Woods State Park. After conducting hearings investigating the allegations against DiPrete, the commission unanimously concluded that DiPrete had violated the Code of Ethics with respect to both the Jamestown Bridge and the Olney Pond matters. The commission assessed $30,000 in fines against DiPrete.

To achieve clarity, we shall set out the underlying facts relating to each matter separately. The facts surrounding the Jamestown Bridge (bridge) matter are as follows. In 1984 the State of Rhode Island contracted with an amalgamation of firms known as the Clarke–Fitzpatrick Franki Foundation (Clarke–Fitzpatrick) for construction of the bridge. In late 1986 disputes between the state and Clarke–Fitzpatrick arose concern-

ing the quality and the method of construction of the bridge. By mid 1987 construction of the bridge was considerably behind schedule, and Clarke–Fitzpatrick had asserted claims against the state in excess of $40 million. After being informed by the Attorney General's office that it would not handle the impending litigation surrounding the bridge, the Department of Transportation (DOT) decided that the magnitude of the suit necessitated the hiring of outside legal counsel.

In September 1987 a list of six local law firms that appeared to have the qualifications necessary to handle the lawsuit was generated by DOT. Veronica Ridolphi (Ridolphi), chief legal counsel for DOT, sent a letter to each of the law firms, requesting a statement of qualifications. Matthew Gill (Gill), director of DOT, testified that it was during a brainstorming session of DOT that someone suggested adding the name of the Rhode Island law firm of Taft & McSally. Gill could not remember who specifically suggested adding the name of Taft & McSally to the list of law firms solicited. A letter was subsequently forwarded to Taft & McSally. The law firm of Taft & McSally was not on the original list generated by DOT. James Taft, Jr. (Taft), a principal in the law firm, preceded DiPrete as mayor of the city of Cranston and is a close friend and political associate of DiPrete's. Taft has held various leadership positions, including finance chairman, in DiPrete's campaigns for Governor.

The relationship between DiPrete and Taft expanded into areas outside politics. In April 1986 a construction company by the name of DiPrete/Laurienzo was formed with DiPrete as a one-third owner. Sometime during August 1987 a partnership-trust agreement was executed whereby Taft and DiPrete/Laurienzo agreed to form a partnership called Atwood Associates Realty Trust

---

1. A review of the record informs this court that the commission received the complaint against DiPrete on January 18, 1989. Our examination of the decision of the trial justice indicates that he applied the 1990 Reenactment of the Code of Ethics. The behavior that led to the filing of the complaint occurred prior to the 1990 Reenactment and consequently G.L.1956 (1984 Reenact-

ment) Chapter 14 of title 36, as enacted by P.L. 1987, ch. 195, § 3 must be applied. We note that the 1990 Reenactment simply added gender-neutral language to the statutes under review. Consequently the application of the 1990 Reenactment would not have altered our analysis or the result reached had we applied it.

(Atwood). Atwood purchased and sold real estate in the city of Cranston.

On or about September 11, 1987, Ridolphi received three proposals from Rhode Island law firms presenting their qualifications for the bridge litigation. One of these proposals was a joint proposal from the law firms of Taft & McSally and Carroll, Kelly & Murphy (joint firm), a Providence law firm with a concentration in litigation. Ridolphi forwarded the proposals to Gill, who subsequently chose the joint firm to represent the state in the bridge litigation. The legal problems surrounding the bridge were extensively litigated, and as of December 1991 the law firm of Taft & McSally had received $258,125 in legal fees and Carroll, Kelly & Murphy had received $465,282.

The commission found that as a result of the joint firm's being awarded the contract, DiPrete had violated §§ 36–14–5(a) and (d), 36–14–7(a), and 36–14–6. The trial justice held that the commission's decision was supported by competent and reliable evidence and affirmed its decision.

The facts surrounding the Olney Pond project are as follows. Prior to DiPrete's election as Governor, a study of public records had disclosed that a select few architectural and engineering firms were receiving the majority of state contracts in those fields. In response to this situation DiPrete issued Executive Order No. 85–23, whose purpose it was to "conduct the business of the state in an open and orderly manner." Executive Order No. 85–23 was superseded by Executive Order No. 86–13, and although there were some minor changes, the intent of the order remained the same. The executive order mandated that all state contracts for architectural or engineering services equal to, or in excess of, $20,000 were to be awarded to a particular firm only after that firm had been qualified as acceptable by the architectural-and-engineering-services selection committee (committee).

The committee reviewing the Olney Pond matter consisted of four members, Dennis Lynch (Lynch), the State purchasing agent, designated as the chairman of the committee; Mathias Santos (Santos), the director of administration's designee; Gilbert Parrillo, a public member; and Judith Benedict (Benedict), who represented the Department of Environmental Management (DEM), the agency requesting the service being reviewed.

The general purpose of the committee was to review proposals submitted by private firms in response to solicitations for state architectural or engineering work. Once a firm's qualifications for a particular project were reviewed, the committee was required to prepare a list of at least three firms (the short list), that the committee considered technically and professionally qualified for the specific project. According to the executive order, this short list was then to be forwarded to the director of administration, Frederick Lippitt (Lippitt), who was in turn to make the final selection of the firm to be awarded the contract. This process was designed to award state contracts more effectively and honestly irrespective of political liaisons.

During the summer of 1987 DEM applied to the United States Environmental Protection Agency for a grant in order to conduct a water-quality study in the Olney Pond located in Lincoln Woods State Park. A $100,000 grant was subsequently awarded to DEM. The DEM provided public notice, by advertising and by direct mail, of the proposed study. One of the firms notified by DEM was Tutela Engineering Associates, Inc. (Tutela), a Rhode Island corporation wholly owned by Domenic Tutela. Domenic Tutela, either in an individual capacity or as a representative of his corporation, had contributed some $20,500 to DiPrete's gubernatorial campaigns over a four-year period. In response to the public notice of the proposed study, DEM received eight proposals, including one from Tutela. The DEM determined that two of the eight proposals were acceptable to conduct the study, namely, proposals submitted by Lycott Environmental Research, Inc. (Lycott), and I.E.P., Inc. (IEP). Benedict informed Lynch by memorandum, that DEM recommended Lycott but that IEP would also be acceptable.

The committee reviewed all eight proposals and selected four firms to be placed on

the short list. In addition to Lycott and IEP, the committee unanimously voted to place Tutela and Environmental Scientific Corporation/Rhode Island Analytical Laboratories, Inc. on the short list. The DEM had judged Tutela less qualified than the majority of the other firms it had reviewed for the project, placing it seventh out of the eight proposals received. The committee members, although questioned ad infinitum about the addition of Tutela, could not recall who had suggested adding Tutela to the short list.

Subsequently the committee forwarded the short list, with the qualified firms listed in alphabetical order, to Lippitt's office. Upon receipt of the short list, Lippitt then forwarded it to DiPrete for his designation of the firm to whom the contract would be awarded. On April 15, 1988, Tutela was chosen for the Olney Pond project. Subsequent to the selection of Tutela, Benedict forwarded a memorandum to Lippitt objecting to Tutela's selection. This memorandum started a series of correspondence that ultimately led to the rescission of the award of the project to Tutela. On September 26, 1988, Lippitt advised Lynch that he had reconsidered the award and had reselected Lycott for the Olney Pond project.

The commission found that as a result of Tutela's being originally selected for the Olney Pond project, DiPrete had violated § 36-14-5 subsections (a), (d), and (g); § 36-14-7(a) and § 36-14-6.[2] The trial justice found that the commission's decision was supported by competent and reliable evidence and affirmed its decision.

In accordance with G.L.1956 (1993 Reenactment) § 42-35-16, this court employs a limited standard of review when reviewing appeals from a decision of an administrative agency pursuant to a writ of certiorari. *Berberian v. Department of Employment Security, Board of Review,* 414 A.2d 480, 482 (R.I.1980). We shall review only questions of law that appear in the record. *Id.* The

grounds for reversal must appear on the face of the record. *Id.* We do not weigh the evidence but merely search for any legally competent evidence that supports the decision under review. *Id.* "In reviewing a decision of the trial court by way of certiorari, this court applies the 'some' or 'any' evidence test and reviews the record to determine whether legally competent evidence exists to support the findings." *Sartor v. Coastal Resources Management Council,* 542 A.2d 1077, 1082–83 (R.I.1988). When reviewing a judgment of the Superior Court that has affirmed a decision of an agency, we examine the record to determine if there is evidence or reasonable inferences to be drawn from the evidence to support the decision of the tribunal. *Celona v. Rhode Island Ethics Commission,* 544 A.2d 582, 585 (R.I. 1988). When more than one inference is possible, the reviewing court may not substitute its judgment for that of the agency and must affirm the decision of the agency unless its findings are clearly erroneous. *Guarino v. Department of Social Welfare,* 122 R.I. 583, 410 A.2d 425 (1980). "Should we find the record deficient, 'an administrative decision can be vacated if it is clearly erroneous in view of the reliable, probative, and substantial evidence contained in the whole record.' " *Environmental Scientific Corp. v. Durfee,* 621 A.2d 200, 208 (R.I.1993).

I

The Jamestown Bridge Matter

DiPrete contends that the trial justice and the commission erred by (1) misapplying § 36-14-5(a) and (d), § 36-14-7(a), and § 36-14-6, and (2) imposing fines that were excessive and not supported by the evidence. DiPrete also contends that the commission conducted hearings that were devoid of fundamental fairness, denying him his due-process rights.

Section 36-14-5(a), as enacted by P.L. 1987, ch. 195, § 3 provides:

2. The decision and order of the commission noted a violation of § 36-14-5(*b*). Our review of the decision of the trial justice and the parties' memoranda does not reveal a violation of § 36-14-5(b) but instead notes a violation of § 36-14-5(*d*). We deem the reference to § 36-14-5(b) in the decision and order of the commission an inadvertent typographical error. We analyze subsection (*d*), and note that our decision and analysis are unaffected by the typographical error.

"No person subject to this code of ethics shall have any interest, financial or otherwise, direct or indirect, or engage in any business, employment, transaction or professional activity, or incur any obligation of any nature, *which is in substantial conflict* with the proper discharge of his duties or employment in the public interest and of his responsibilities as prescribed in the laws of this state, as defined in section 36–14–7." (Emphasis added.)

Section 36–14–7(a), as enacted by P.L.1987, ch. 195, § 3 defines a substantial conflict as a person's having a

*"reason to believe or expect* that he or his spouse (if not estranged) or any dependent child, or any business associate or any business by which said person is employed or which said person represents will derive a direct monetary gain or suffer a direct monetary loss, as the case may be, *by reason of his official activity."* (Emphasis added.)

Section 36–14–5(d) prohibits a public official from using his or her public office, or confidential information obtained through a public office, to obtain financial gain for himself or herself or for a related party. Section 36–14–6, as enacted by P.L.1987, ch. 195, § 3 prescribes the steps that an official must take when his or her official activity requires him or her "to take an action, make a decision or refrain therefrom that will or can reasonably be expected to directly result in an economic benefit" to him or herself or to a related party. The official shall, among other possible action, "before taking any such action or refraining therefrom" file a written statement with the commission of the conflict of interest. *Id.*

DiPrete employs most of his argument on the bridge matter in an effort to rebut the finding of the commission, upheld by the trial justice, that DiPrete was a business associate of Taft's. Before we reach DiPrete's "business associate" argument, we must first determine that it was DiPrete's official activity that caused Taft & McSally to be selected.

Section 36–14–7(a) describes a substantial conflict as one that results from an expectation of financial gain to the public figure or to a related party "by reason of [the public figure's] official activity." Both §§ 36–14–5(d) and 36–14–6 require some action on behalf of the public official, or a failure to act with knowledge of the possible conflict, that causes the conflict to arise. Therefore, our initial analysis of the bridge matter must begin with an inquiry into whether DiPrete took any official action that caused the selection of the joint firm.

The record must persuade us that such an official action as will invoke that statutory dictate occurred.

"A conflict exists when 'by reason of his [or her] *official activity* ' an official will benefit himself [or herself], his [or her] spouse, his [or her] dependent child, his [or her] business associate, or a business activity in which he [or she] is involved. * * * We find from an examination of this statutory language * * * a consistent indication that all that is required of an official is *the avoidance of any official action* over a particular matter that represents the source of conflict." (Emphasis added.) *In re Advisory Opinion to the Governor,* 504 A.2d 456, 461 (R.I.1986) (analyzing the former Rhode Island Conflict of Interest Laws, chapter 14 of title 36, repealed effective June 25, 1987).

An act is defined as "[t]hat which is done or doing; the exercise of power, or the effect whose cause is power exerted; a performance; a deed." Webster's New International Dictionary, 25 (2nd Unabridged ed. 1935). An official act is " '[o]ne done by an officer in his official capacity under color and by virtue of his office.' " *Celona,* 544 A.2d at 586.

■ The commission found that DiPrete "expressed orally or by informal note to Gill that the firm of Taft & McSally be considered for the position." The commission appears to have placed its reliance on the testimony of Lynette Labinger (Labinger) in reaching a conclusion that DiPrete's official activity caused the joint firm to be selected. Labinger is the law partner of the commission's attorney-designee, John Roney (Roney). Roney presented the case against DiPrete to the commission. Labinger testified that she was present at a meeting with

Roney and DiPrete when DiPrete stated that he had written a memorandum to Gill stating that outside counsel was needed for the bridge litigation and *he* suggested the firm of Taft & McSally. Labinger testified that DiPrete averred that Gill then initiated DOT's process in soliciting counsel, and from that point forward he had no activity in the selection process. When asked for a copy of the memorandum, DiPrete suggested that there was a possibility that no such memorandum existed and that he may have made the suggestion orally.

DiPrete testified that he initially thought a memorandum suggesting a number of firms had been forwarded to Gill. A subsequent investigation clarified that no such memorandum had been sent to Gill. DiPrete's recollection was that he had sent a handwritten note, on the reverse side of a memorandum he had received from Gill, stating that he had no specific objections to the selection of any law firm from outside the state but suggested that Gill consider qualified law firms within Rhode Island. DiPrete testified that the "bottom line" was that he did not specifically recommend Taft & McSally or any other law firm.

Taft testified that he never spoke to DiPrete or any DiPrete family member regarding the selection. Taft stated that his conversations with DiPrete regarding the bridge took place after the joint firm had been retained. Taft testified that it was his idea to contact the law firm of Carroll, Kelly & Murphy and suggest a joint proposal for the bridge litigation. Carroll, Kelly & Murphy was one of the initial law firms that had received a letter from DOT requesting their qualifications in handling the impending bridge litigation.

Peter Palombo, Jr. (Palombo), executive counsel to DiPrete at the time of the bridge litigation, testified that DiPrete never mentioned or suggested to him that Taft & McSally be considered for the bridge litigation. Palombo asserted that he never spoke to Gill or Ridolphi about adding Taft & McSally's name to the list of law firms to be considered for the litigation.

Ridolfi testified that she was told by Gill to add the name of Taft & McSally to the list of law firms being solicited by DOT. Ridolfi stated that she expressed her concerns to Gill regarding the addition of Taft & McSally because she knew that Taft was a "close associate" of DiPrete and was concerned about the public perception if Taft & McSally was retained as legal counsel. Subsequently Ridolfi was informed by Gill that he had chosen the joint firm. Ridolfi averred that Gill chose the joint firm for a number of reasons, one of which was that Taft had the trust of the Governor.

Gill testified that it was DiPrete's "general concern" to hire qualified Rhode Island entities to do state work whenever possible. Gill unequivocally stated that it was his decision to hire the joint firm. He stated that DiPrete never mentioned the name of Taft & McSally before the joint firm was selected.

The commission was faced with the standard witness-credibility issue. The commission was free to weigh the credibility of all the witnesses and to decide the issue on the basis of whom they believed to be more credible. The commission placed its reliance on the recollection of Labinger. This court does not substitute its judgment for that of the agency in regard to witness credibility. *Costa v. Registrar of Motor Vehicles*, 543 A.2d 1307, 1309 (R.I.1988). When more than one inference is possible, we may not substitute our judgment. *Guarino v. Department of Social Welfare*, 122 R.I. 583, 410 A.2d 425 (1980). There was *some* evidence to support the commission's finding that DiPrete had caused the joint firm to be selected. *Sartor*, 542 A.2d at 1082–83. Although our review of Gill's testimony seemed to enhance the credibility of DiPrete's position, the trial justice was not clearly wrong in upholding the commission's finding that DiPrete's official action had caused the joint firm to be selected. *See Environmental Scientific Corp.*, 621 A.2d at 208.

■ DiPrete next contends that he was not a "business associate" of Taft's and consequently could not have had a substantial conflict as outlined in § 36–14–7(a). Section 36–14–2, as enacted by P.L.1987, ch. 195, § 3, defines a business associate as "a person joined together with another person to

achieve a common financial objective." The record reflects that as of April 1986 DiPrete was a one-third owner in DiPrete/Laurienzo construction company. Sometime during August 1987 a partnership-trust agreement was executed whereby Taft and DiPrete/Laurienzo formed Atwood. DiPrete/Laurienzo owned 80 percent of the partnership while Taft owned the remaining 20 percent. A simple exercise in arithmetic leads us to the conclusion that as a result of DiPrete/Laurienzo's owning 80 percent of the new partnership, DiPrete, as a one-third owner of DiPrete/Laurienzo, acquired approximately a one-quarter ownership interest in Atwood. Taft acquired a one-fifth ownership interest in Atwood. Therefore, DiPrete and Taft were joined together to achieve a common financial objective, the success of the partnership. Consequently the record yields adequate evidence to support the conclusion that DiPrete and Taft were business associates. We note that the definition of business associate, as outlined in the statute, appears quite broad. We are persuaded that the record reflects that even if the respective ownership interests in Atwood were not so significant as noted, the relationship would in fact be within the statutory language.

DiPrete argues that even if he and Taft were considered business associates, he did not violate § 36–14–5(a) or § 36–14–7(a) because he and Taft were not business associates at the time he allegedly interceded on Taft's behalf. The commission contends that the record contains ample evidence to support the finding that DiPrete and Taft were business associates at the time of the intercession. The record reflects that Ridolfi generated a letter to Taft & McSally requesting a proposal on September 8, 1987. The partnership agreement forming Atwood was not executed until September 9, 1987; however, the agreement was retroactive to August 15, 1987. The trial justice found that "it would be inconceivable to expect that prior to [September 9, 1987] no negotiations between Taft [and] DiPrete/Laurienzo had occurred." Although negotiations alone do not constitute a legal relationship, they may be considered in determining whether two or more people are joined to achieve a common financial objective. Negotiations may be a factor in considering whether a business association exists, but no single factor should be conclusive. We believe that the inference of the negotiations, in addition to the testimony before the commission, and the fact that the partnership agreement was retroactive to August 15, 1987, were sufficient to establish that a business association existed according to the broad definition in the statute. Therefore, the commission could properly and reasonably infer that DiPrete and Taft were business associates at the time DiPrete's official action caused the joint firm to be selected. Consequently the trial justice did not err in holding that DiPrete and Taft were business associates at the time DiPrete interceded on behalf of Taft.

■ DiPrete next avers that there was insufficient evidence to show that he knowingly and willfully violated the statute. Section 36–14–13(d)(6), as enacted by P.L.1987, ch. 195, § 3 provides that "at the conclusion of proceedings concerning such an alleged violation, the adjudicative panel shall immediately begin deliberations on the evidence and then proceed to determine whether there has been a *knowing and willful violation* of this chapter." (Emphasis added.) The chapter is silent concerning the definition of what constitutes a knowing-and-willful violation.

In *Carmody v. Rhode Island Conflict of Interest Commission*, 509 A.2d 453 (R.I. 1986), this court discussed the knowing-and-willful requirement necessary to show a violation of the Rhode Island conflict-of-interest laws. In *Carmody* we adopted different analyses of what constitutes a knowing-and-willful violation of the statute depending upon the reasonableness of the violation. *Id.* at 460–61. Because the statutes analyzed in *Carmody* were part of the conflict-of-interest law that preceded the present Code of Ethics and because the present code does not enlighten us about what a knowing-and-willful violation of the code involves, our analysis in *Carmody* is precedential and persuasive.

This court has held that when a violation of the statute is reasonable and made in good faith, it must be shown that the official "either knew or showed reckless disregard for

the question of whether the conduct was prohibited by [the] statute * * * ." *Id.* at 460. Consequently an official may escape liability when he or she acts in accordance with reason and in good faith. We have observed, however, that it is "difficult to conceive of a violation that could be reasonable and in good faith." *Id.* at 461. In contrast, when the violative conduct is not reasonable, it must be shown that the official was " 'cognizant of an appreciable possibility that he [might] be subject to the statutory requirements and [he] failed to take steps reasonably calculated to resolve the doubt.' " *Id.* at 461.

 As noted above, it may be difficult to conceive of a violation that could be "reasonable and in good faith." We do not believe that DiPrete's violation of the statute was in accordance with reason or in good faith. The commission had before it a record of sufficient evidence to conclude that DiPrete's actions were deliberate and unreasonable. DiPrete, as chief executive, was at least aware of an appreciable possibility that he might be subject to the statutory requirements, and he failed to take *any* steps to resolve that problem, such as delivery of a statement of potential conflict of interest to the commission. *See* § 36–14–6.

DiPrete next contends that the fines imposed by the commission and approved by the trial justice were excessive and not supported by the evidence. At the time of these hearings, the commission was authorized by § 36–14–13(e)(3) to assess civil penalties of not more than $10,000 for each violation of the chapter. As a result of his involvement in the bridge matter, DiPrete was fined $10,-000 for violating § 36–14–5, subsections (a) and (d). In addition he was fined $5,000 for failure to prepare and to deliver a copy of a statement of the potential conflict to the commission, as mandated by § 36–14–6.

DiPrete initially contends that absent a showing of a knowing-and-willful violation of the statutes, civil penalties cannot be assessed. Premised upon our discussion and disposition of the previous issue, our finding is that this contention is without merit. The evidence of record supports a knowing-and-willful violation of the statute.

 DiPrete further argues that the civil penalties assessed against him were in violation of article 1, section 8, of the Rhode Island Constitution. Article 1, section 8, states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted; and all punishments ought to be proportioned to the offense." DiPrete's contention that the commission based the amount of the fine on the amount of its projected budget shortfall for the fiscal year is unsupported by the evidence of record.

We believe that a sum total $15,000 fine is proportioned to the offenses. *See* R.I. Const. art. 1, sec. 8. A business associate of DiPrete's, as of the date of the ethics hearings, gained some $250,000 as a result of DiPrete's actions. The commission, in carrying out the intent of the Code of Ethics, responded reasonably to the mandate of the law, on the basis of the evidence of record. DiPrete's comparison of the minimal fines mandated in *Carmody* does little to persuade us that these fines are excessive. The facts of *Carmody* did not concern financial gain accruing to the parties involved, nor did the facts in *Carmody* rise to the level of the record before this court in the instant case. We find that the civil penalties assessed were fair and reasonable and did not violate article 1, section 8, of the Rhode Island Constitution.

DiPrete's contention that the ethics panel conducted a hearing that was devoid of fundamental fairness will be discussed later in this opinion.

II

The Olney Pond Matter

DiPrete contends that the trial justice and the commission erred by (1) misapplying § 36–14–5, subsections (a), (d), and (g); and § 36–14–7(a) and § 36–14–6, and (2) imposing fines that were excessive and not supported by the evidence. DiPrete also avers that the trial justice and the commission made several other errors violating the Rhode Island Rules of Evidence; however, we need not evaluate those contentions as

our analysis under DiPrete's first argument will be dispositive of the Olney Pond matter.

We have outlined § 36–14–5(a) and (d), § 36–14–7(a), and § 36–14–6 in our analysis under the bridge matter and need not repeat those texts. Section 36–14–5(g) prohibits a public official or a related party from "solicit[ing] or accept[ing] any gift, loan, [or] political contribution * * * based on any understanding that the * * * official action * * * would be influenced thereby."

■ Our analysis begins with the query concerning whether DiPrete took any official action that caused Tutela to be selected for the Olney Pond project. There is adequate evidence supporting the commission's finding of fact that DiPrete designated and selected Tutela. Lippitt testified that he had general conversations with DiPrete and that it was his understanding that DiPrete wanted to make the final selection from the short lists. DiPrete testified that it was his usual practice to indicate his "input or my say or recommendation" on the short lists. DiPrete testified that Tutela was his "personal recommendation for the [Olney Pond project]." He stated that he made his recommendation "pursuant to" his usual practice involving the short lists.

It is DiPrete's position that his role was limited to a "recommendation to an expression of opinion to the director of administration who was free to accept or reject it." We believe, as did the trial justice, that this argument is one of semantics and not of substance. Sufficient evidence exists in the record to support the premise that it was DiPrete's action, whether by recommending or by selecting, that caused Tutela to be chosen for the Olney Pond project. In this instance DiPrete failed to avoid official action over a matter that could have represented a potential conflict. *In re Advisory Opinion to the Governor*, 504 A.2d at 461. Parenthetically we note that by his actions DiPrete violated his own executive order that delegated the authority to select the firm to the director of administration. We do not render any opinion on the ethical consequences of that behavior, but we question whether that action contributed to any appearance of impropriety that may have existed.

■ DiPrete contends that he did not violate §§ 36–14–5(a) or 36–14–7(a) because Tutela was not a business associate and because he took no official action that secured monetary gain for Tutela because Tutela never actually received the project. The statute does not specifically require that a person or entity actually *receive* the monetary gain or loss. The trial justice noted that this "precludes an official from embarking upon an avenue of potential financial gain." DiPrete also ignores the fact that § 36–14–7(a) includes obtaining a financial benefit for oneself as constituting a substantial conflict. The trial justice held that DiPrete "was acutely aware that Tutela was a significant contributor to his gubernatorial campaigns. These contributions directly benefited [DiPrete] in the form of providing valuable and essential monies for [DiPrete's] campaigns." The trial justice affirmed the commission's finding that by selecting Tutela, DiPrete had reason to believe or to expect that his official action could lead to direct monetary gain in the form of campaign contributions.

■ Section 36–14–7(a) defines a substantial conflict as one in which the public figure has "*reason to believe or expect that he or [a related party] * * * will derive a direct monetary gain [or loss] * * * by reason of his official activity.*" (Emphasis added.) We believe the record is devoid of any competent, reliable evidence that DiPrete ever received or had an expectation of receiving any financial remuneration specifically for selecting Tutela for the Olney Pond project. Although we are mindful that the subject of political-campaign contributions places us in a realm that may implicate First Amendment guarantees, we are also aware of the danger in defining a person's "reason to believe" or a person's expectations differently simply because they are involved in a political climate. We are not adhering to the former proposition but are simply reviewing whether the facts of record are adequate to find a sufficient belief or expectation of monetary gain.

Tutela had performed work for the city of Cranston while DiPrete was mayor. Between 1984 and August 1988 Tutela contrib-

uted some $20,500 to DiPrete's campaigns for Governor. Tutela testified that he had bid on and received state projects between 1985 and 1987, specifically recalling two such projects. Tutela testified that he stopped contributing to DiPrete's campaign after an article in the Providence Journal linked his political contributions with deferential treatment from the Governor. Tutela believed that his contributions were unfairly harming DiPrete's reputation and his own and therefore decided to prevent any possibility of further harm. Tutela averred that he did bid on and receive state projects after his contributions ceased.

A general expectation of receiving political contributions will not fulfill the "reason to believe or expect" requirement of § 36–14–7(a). More than a blind expectation of monetary gain must be demonstrated.

" 'No politician who knows the identity and business interests of his campaign contributors is ever completely devoid of knowledge as to the inspiration behind the donation. There must be more specific knowledge of a definite official act for which the contributor intends to compensate before an official's action crosses the line * * * .' " *United States v. Arthur,* 544 F.2d 730, 734 (4th Cir.1976).

As the trial justice noted, illegal political schemes will rarely be memorialized in formal agreements, but the lack of a "smoking gun" will not be fatal. We believe that there must be some evidence to suggest that some form of a *quid pro quo* existed between the contributor and the official regarding the inspiration behind the donation. A tacit understanding between DiPrete and Tutela would have been sufficient. We find no such understanding or agreement in any evidence of record. We note that a tacit understanding need not be shown by direct evidence only but can be proven by sufficient circumstantial evidence. *See United States v. Vap,* 852 F.2d 1249, 1255 (10th Cir.1988).

It appears that the Legislature intended to prohibit conflicts of interest in which political favoritism is clear and unambiguous and situations in which the appearance of impropriety exists even though clear and direct evidence of political favoritism is absent. This

court has stated that the "appearance of impropriety alone [may be] 'simply too slender a reed on which to rest a [decision].' " *In re Advisory Opinion to the Governor,* 633 A.2d 664, 667 (R.I.1993) (quoting *Olivier v. Town of Cumberland,* 540 A.2d 23, 27 (R.I. 1988)).

> "The line is a fine one between an altogether 'voluntary' payment and the conferring of a benefit on someone who holds a particular public office in * * * expectation of [a] benefit." *United States v. Barber,* 668 F.2d 778, 783 (4th Cir.), *cert. denied,* 459 U.S. 829, 103 S.Ct. 66, 74 L. Ed. 2d 67 (1982).

The evidence of record does not support the proposition that anything more than a blind expectation of monetary gain may or may not have existed. A review of Tutela's campaign-contribution history does not lend credence to the proposition that the contributions represented evidence of any understanding, tacit or otherwise, between DiPrete and Tutela. We believe that the commission and the trial justice erred by adducing that an agreement did exist between DiPrete and Tutela for some form of political favoritism. The record is deficient of reliable, probative evidence to support the proposition that DiPrete had a reasonable belief in or expectation of monetary gain as a result of his selection of Tutela.

Consequently, since the record is deficient in establishing sufficient evidence to show that an adequate *quid pro quo* existed, the trial justice erred in upholding the commission's finding that DiPrete had violated §§ 36–14–5(a) and 36–14–7(a). Additionally, since there was insufficient evidence to show that any understanding or agreement existed, neither can there be a violation of § 36–14–5, subsection (d) or (g). Finally, because there was an insufficient nexus between the possible expectation of monetary gain and the contribution, there was insufficient evidence to conclude that a violation of § 36–14–6 had likewise occurred.

DiPrete also contends that the commission members ceased to function as impartial triers of fact. Upon our examination of the transcript we do not believe that the behav-

ior of the commission members rose to a level that jeopardized DiPrete's due-process rights. However, we wish to respond to this argument. We note that the resolution of investigating, inquisitorial, and adjudicative roles in a single administrative body has been a subject of comment by parties to administrative law proceedings. *See, e.g., La Petite Auberge, Inc. v. Rhode Island Commission for Human Rights,* 419 A.2d 274, 284 (R.I.1980). A "hearing officer must be impartial and must not attempt to establish proof to support the position of any party to the controversy." *Davis v. Wood,* 427 A.2d 332, 337 (R.I.1981). However, the officer is allowed to interrupt witnesses to clarify the testimony. *Id.*

In reviewing the transcripts, we note that there were many circumstances in which commission members were properly asking questions to clarify responses from witnesses. However, we did note several instances in which commission members made gratuitous comments. These comments, although not jeopardizing the integrity of the proceedings, were superfluous and tasteless. We deem our statement of this response necessary and constructive because the present environment portends a higher frequency of ethics hearings. Commission members should be aware of their important responsibilities as well as their limitations. *See generally* chapter 35 of title 42 and chapter 14 of title 36.

Accordingly, for the reasons stated, the petition for certiorari with regard to the Jamestown Bridge matter is denied; the writ heretofore issued is quashed. The petition for certiorari with regard to the Olney Pond matter is granted, and the judgment appealed from is quashed. The papers in this case are remanded to the Superior Court with our decision endorsed thereon.

FAY, C.J., did not participate.