DECISION
These consolidated matters are before the Court for decision following a hearing predicated on a Joint Statement of Undisputed Facts, the Joint Undisputed Exhibits, and arguments by counsel of record.[1] The parties seek injunctive relief and a declaration by the Court regarding the constitutionality of the Act Relating to Cities and Towns — Providing Financial Stability, G.L. 1956 § 45-9-1 et seq. (Act) and the propriety of certain appointments made to the Central Falls Housing Authority (CFHA) and Central Falls Detention Center Corporation.
 I Facts and Travel
The following facts are undisputed. On July 16, 2010, Mark A. Pfeiffer (Receiver or Pfeiffer) was appointed by the state of Rhode Island's Director of Revenue to serve as Receiver of the City of Central Falls pursuant to the terms of the Act. (Joint Statement of Undisputed *Page 3 
Facts ¶ 1.) At all times material to this matter Rosemary Booth Gallogly (Director of Revenue) was the Director of the Department of Revenue and the Acting Director of the Department of Administration of the state of Rhode Island. Id. ¶ 9.
The City of Central Falls (City or Central Falls) is a duly organized municipal corporation that has a Home Rule Charter adopted in accordance with the Rhode Island State Constitution. The City's governance includes the Mayor as chief executive officer, and the City Council as the legislative branch. Id. ¶ 10. The City Council is comprised of five members who are elected by the electorate of the City. Id. ¶ 11. The Mayor is also an elected official, elected by the residents of the City.Id. ¶ 12.
Charles D. Moreau (Moreau or Mayor) is the Mayor of Central Falls.Id. ¶ 2. At all times material to this matter, William Benson, Jr. (Benson), Richard Aubin, Jr. (Aubin), Eunice DeLaHoz (DeLaHoz), Patrick J. Szlastha (Szlastha), and James Diossa (Diossa) (collectively, City Council) were members of Central Falls' City Council. Id. ¶¶ 3-8.
On May 18, 2010, the City Council by Resolution, along with the Mayor, authorized the filing of a Verified Petition for Appointment of Receiver with the Providence County Superior Court.Id. ¶ 13. After a review of the petition and hearing on the same, on May 19, 2010, this Court entered an order appointing Jonathan N. Savage as Temporary Receiver of the City upon the terms and conditions, and with the powers therein contained.Id. ¶ 14; see Joint Ex. E.
On June 9, 2010, the Rhode Island Senate passed the Act.Id. ¶ 15. On June 10, 2010, the Rhode Island House of Representatives passed the Act. Id. ¶ 16. On June 11, 2010, the Governor, the Honorable Donald L. Carcieri, signed the Act into law. Id. ¶ 17. In response to the enactment of the Act, on June 18, 2010, Moreau and the City Council withdrew their motion for the appointment of a judicial receiver and this Court entered a Consent Order outlining the *Page 4 
transition period from the judicial receivership to the non-judicial receivership as required pursuant to the Act.[2]Id. ¶ 18; see Joint Ex. G.
As part of the transition to a non-judicial receivership, in a July 16, 2010 letter, the Director of Revenue appointed Pfeiffer as receiver for the City. Id. ¶ 19; see Joint Ex. J. Pfeiffer, by a letter dated July 19, 2010, informed Moreau that he had been appointed receiver of Central Falls and had assumed the duties and functions of the Office of Mayor.Id. ¶ 20; see Joint Ex. L. Pfeiffer further instructed Moreau that pursuant to his powers under § 45-9-7, Moreau was to henceforth act solely in an advisory capacity.[3]Id. ¶ 20; see Joint Ex. L.
As of the July 16, 2010 letter, the Receiver has assumed all of Moreau's duties as both Public Safety Director and Mayor.Id. ¶ 24. On July 19, 2010, Moreau was required to relinquish his City vehicle, cell phone, and his keys to City Hall.Id. ¶ 21. Prior to July 19, 2010, Moreau was not afforded a hearing or an opportunity to be heard with respect to the Receiver's decision to assume the duties and functions of the Office of Mayor, including the Mayor's duties as Public Safety Director.Id. ¶ 22.
On September 13, 2010, the Receiver appointed Edna Poulin to the CFHA for a five-year term and informed Milad Shabo[4] that a successor had been appointed to his position.Id. ¶ 25; see Joint Exs. N O. Edna Poulin was subsequently qualified as a commissioner of the CFHA *Page 5 
by the filing of a certificate with the City's Clerk and by the administration of the oath of office. Id.
As Receiver, Pfeiffer has rescinded the August 4, 2010 and September 20, 2010 Resolutions of the City Council.[5] Id. ¶ 23. The City Council's August 4, 2010 Resolution authorized the appointment of Lawrence L. Goldberg, Esq. as attorney for the City Council, and the September 20, 2010 Resolution authorized the engagement of Attorneys Michael A. Kelly and John O. Mancini of the Law Offices of Michael A. Kelly, P.C. to file a legal action to determine the legality and constitutionality of the Act. Id. ¶ 26;see Joint Ex. P. By a letter dated September 22, 2010, from the Receiver to Benson, the Receiver rescinded the September 20, 2010 Resolution. Id. ¶ 27; see
Joint Ex. Q.
On September 22, 2010, the City Council scheduled a meeting for September 24, 2010 at 5:30 p.m. Id. ¶ 29. The posted Agenda included consideration of Moreau's putative appointments of Milad Shabo and Gladys Burns to the CFHA and Clarise Thompson and Shawne Thomas to the Central Falls Detention Center Corporation.Id. ¶ 29; Joint Ex. T.
Additionally, on September 22, 2010, the CFHA filed a Motion for Declaratory Judgment seeking a declaration that Milad Shabo remain as a commissioner of the CFHA and a declaration that the Receiver exceeded his legal authority in appointing Edna Poulin.[6]Id. ¶ 28. On September 23, 2010, the Receiver filed a Complaint seeking a preliminary injunction and temporary restraining order against Moreau and Benson. Id. ¶ 30. On September 27, 2010, Moreau and the City Council filed a Motion for a Preliminary Injunction and Temporary *Page 6 
Restraining Order against the Receiver. Id. ¶ 31. By agreement, the parties filed a motion with the Court consolidating the Receiver's action with that of Moreau and the City Council. Additionally, the parties agreed that the October 5, 2010 hearing would combine their requests for preliminary and permanent injunctions.[7]
The Court also takes notice of the following relevant facts. Central Falls is in an "extraordinary" fiscal crisis. (June 18, 2010 Tr. 14.) Even before requesting a judicial or non-judicial receivership, Central Falls had already requested that the General Assembly grant it the authority to file for a Chapter 9 bankruptcy proceeding. Id.
A June 30, 2009 independent audit showed that the City had total net assets of negative $16,866,819. (Verified Pet. for Appointment of Receiver ¶ 6.) The City's annual operating budget for fiscal year 2010 and the proposed budget for 2011 was just under $18,000,000, with a shortfall of $3,000,000 and projected shortfall of over $5,000,000 respectively. Id. ¶ 7. The City also has a municipal bond indebtedness of over $10,000,000.Id. ¶ 10.
Furthermore, in order to satisfy its annual pension obligations, the City sold off much of its chief pension fund assets.Id. ¶ 8. The pension accrued liability exceeding $35,000,000, with assets of approximately $4,000,000. Id. The City's audit reports indicate that for fiscal year 2009 the City failed to make any contributions to the pension despite having a required contribution of over $2,700,000, and at the time the City petitioned for the appointment of a receiver, it had no funds available to satisfy over $1,500,000 in obligations for fiscal year 2010. Id. *Page 7 
In light of this "extreme fiscal stress," on May 18, 2010, the City Council passed a Resolution joining the Mayor in his petition for the appointment of a receiver "to exercise all the powers necessary and reasonable to return the City to solvency with a budget that is balanced." See Joint Ex. C. As a result of the receivership, Central Falls' capital markets credit rating was immediately reduced to junk bond status. Id. at 4. State officials were told by municipal finance advisors and rating agencies, that as a result of such receiverships, the capital markets would view debt financing to Rhode Island municipalities as extremely risky and it would become more expensive for municipalities to borrow in the capital markets.Id. at 4-5.
With many of Rhode Island's municipalities already financially stressed, the General Assembly determined that receivership proceedings — such as the one Central Falls had entered — were not in the best interest of the citizens of Central Falls and threatened the financial well-being of Rhode Island and its other municipalities. Id. In light of this perceived threat, the General Assembly revised the then existing § 45-9-1 etseq.[8] to its current form in order to create *Page 8 
a more effective mechanism by which to save Rhode Island and its municipalities from financial disaster. Id. at 5.
 II Standard of Review
In assessing the Mayor and City Council's challenge to the constitutionality of the Act, the court must begin with the principle that legislative enactments of the General Assembly are presumed to be valid and constitutional. Newport Court ClubAssocs. v. Town Council of Middletown,800 A.2d 405, 409 (R.I. 2002) (citing Rhode Island DepositorsEcon. Prot. Corp. v. Brown, 659 A.2d 95, 100 (R.I. 1995)). The court is to approach constitutional questions with great deliberation, caution, and reluctance, and should never declare a statute void unless it finds it to be invalid beyond a reasonable doubt. Gorham v. Robinson,57 R.I. 1, 7, 186 A. 832, 837 (1936). To be deemed unconstitutional, a statute must palpably and unmistakably be characterized as an excess of legislative power. City of Pawtucket v. Sundlun,662 A.2d 40, 44-45 (R.I. 1995).
The party challenging the validity of a statute has the burden of persuading the court beyond a reasonable doubt that it violates an "identifiable aspect of the Rhode Island or United States Constitution." Newport Court, 800 A.2d at 409;Gorham v. Robinson, 57 R.I. at 7, 186 A. at 837. Unless the party challenging the statute's constitutionality can establish beyond a reasonable doubt that a specific provision of the United States or Rhode Island Constitution has been violated, the court will not hold the statute unconstitutional. Sundlun,662 A.2d at 44-45 *Page 9 
(stating that because of the broad plenary power of the General Assembly, the court's evaluation of legislative enactments is extremely deferential); Gorham v. Robinson,57 R.I. at 7, 186 A. at 837 (stating that every intendment in favor of validity should be made by the court unless the Act on its face is repugnant to the Constitution).
 III The Act
Section 45-9-1 et seq. was passed by the General Assembly in response to the fiscal crisis threatening Rhode Island and its municipalities. In § 45-9-1, the General Assembly declared the policy behind the Act and the scope and breadth of its delegation. Section 45-9-1 serves as a guidepost for administrators of the Act and provides:
 "§ 45-9-1. Declaration of Policy and Legal Standard[9]
 "It shall be the policy of the state to provide a mechanism for the state to work with the cities and towns undergoing financial distress that threatens the fiscal well-being, public safety and welfare of such cities and towns, or other cities and towns or the state, with the state providing varying levels of support and control depending on the circumstances. The powers delegated by the General Assembly in this chapter shall be carried out having due regard for the needs of the citizens of the state and of the city or town, and in such a manner as will best preserve the safety and welfare of citizens of the state and their property, and the access of the state and its municipalities to capital markets, all to the public benefit and good." Sec. 45-9-1.
Through the Act's varying levels of support and control, the General Assembly delegated to certain state officials a means to protect the fiscal well-being, public safety, and welfare of fiscally distressed cities and towns. Although on its face, § 45-9-1 appears to be a broad delegation of power, these powers are expressly circumscribed by the terms and standards *Page 10 
contained therein. Not only is an official administering the Act limited to acting for the fiscal well-being, public safety, and welfare of a distressed city or town, but the official must also be acting solely to "best preserve the safety and welfare of citizens . . . their property, and the access of the state and its municipalities to capital markets, all to the public benefit and good."[10] Id.
Moreover, the Act clearly establishes a five-tier mechanism by which state officials may work with a city or town to resolve fiscal instability. At the first tier, a fiscal overseer may be appointed at the request of the city or town's chief executive officer and council or by the director of revenue, in consultation with the auditor general. The director's discretion to appoint an overseer is not unlimited. Under the Act, the director of revenue may only appoint a fiscal overseer independently if he or she finds that:
 "any two (2) of the following events have occurred which are of such a magnitude that they threaten the fiscal well-being of the city or town, diminishing the city or town's ability to provide for the public safety or welfare of the citizens of the city or town:
 "(1) The city or town projects a deficit in the municipal budget in the current fiscal year and again in the upcoming fiscal year;
 "(2) The city or town has not filed its audits with the auditor general by the deadlines required by law for two (2) successive fiscal years (not including extensions authorized by the auditor general);
 "(3) The city or town has been downgraded by one of the nationally recognized statistical rating organizations; *Page 11 
 "(4) The city or town is otherwise unable to obtain access to credit markets on reasonable terms in the sole judgment of the director of revenue.
 "(5) The city or town does not promptly respond to requests made by the director of revenue, or the auditor general, or the chairpersons of the house and/or senate committees for financial information and operating data necessary to assess the financial condition of the city or town in the sole judgment of the director of revenue." Sec. 45-9-3.
At a minimum, these factors serve as a guidepost for officials administering the Act to determine whether a city or town is facing fiscal instability and whether the appointment of a fiscal overseer, budget and review commission, or receiver is necessary.
Once appointed, the fiscal overseer is empowered to (1) recommend fiscal policies; (2) supervise all financial services and activities; (3) provide fiscal advice to city and town officials; (4) provide assistance with municipal financial affairs; (5) assist in the development and preparation of budget and spending plans; (6) review all proposed contracts and obligations; (7) monitor expenditures; (8) approve the annual or supplemental municipal budgets; and (9) report monthly to the director of revenue, the auditor general, the governor and other state officials on the progress made in reducing the municipality's deficit and attaining fiscal stability.See § 45-9-3(d). The goal of the fiscal overseer is to balance the municipality's budget, improve its fiscal policies, and thereby establish fiscal stability.
In the event the fiscal overseer is unable to return the municipality to fiscal stability or resolve the events that led the director of revenue to initially appoint an overseer, the Act *Page 12 
provides for the appointment of a budget and review commission as the second tier.[11] The Act provides that the fiscal overseer
 "shall report in writing to the division of municipal finance if the fiscal overseer concludes that the city or town: (1) [i]s unable to present a balanced municipal budget; (2) [f]aces a fiscal crisis that poses imminent danger to the safety of the citizens of the city or town or their property; (3) [w]ill not achieve fiscal stability without the assistance of a budget commission; or (4) [t]hat the tax levy of the fiscal year should not be approved." Sec. 45-9-5.
If the fiscal overseer believes that a budget commission is necessary, he or she may at any time report this belief to the division of municipal finance.[12] Id.
Upon notice from the division of municipal finance of the fiscal overseer's failure to establish fiscal stability, the director of revenue is authorized to establish a budget and review commission.[13] The budget commission is charged with the responsibility of initiating and implementing "appropriate measures to secure the financial stability of the city or town."[14]
Sec. 45-9-6(a). Given the fiscal overseer's failure to resolve the fiscal crisis, the Act empowers the budget commission not only with the powers and duties delegated to the fiscal overseer, but an *Page 13 
additional twenty delegations set forth in § 45-9-6(d).[15]
Under § 45-9-6, the budget commission shall continue at the discretion of the director of revenue.[16]
As part of the third tier, the Act provides that if the budget commission concludes its powers are insufficient to restore the fiscal stability of the city or town, the director of revenue, upon notice, is authorized to terminate the budget commission and appoint a receiver.[17] At this level, given the exigency of the city or town's fiscal instability, the General Assembly has expanded the receiver's powers beyond those of the fiscal overseer and budget commission. In addition to the powers granted to the fiscal overseer and budget commission under §§ 45-9-2 and 45-9-6, the receiver has
 "[t]he power to exercise any function or power of any municipal officer or employee, board, authority, or commission, whether elected or otherwise relating to or impacting the fiscal stability of the city or town including, without limitation, school and zoning matter." Sec. 45-9-7. *Page 14 
Essentially, upon appointment, the receiver has the right to exercise the power of any officer, employee, board, authority or commission, whether elected or relating to fiscal stability.Id. Although the city or town is directed to continue with elections in accordance with its charter, during the receivership, the powers of the receiver shall be "superior to and supersede" those of the elected officials who serve in an advisory capacity to the receiver. Id.
Additionally, the Act provides a mechanism by which the director of revenue, in consultation with the auditor general, may immediately appoint a receiver to resolve a dire fiscal crisis.See § 45-9-8. In times of a fiscal emergency, where the exigency of a city or town's fiscal condition does not allow for the appointment of a fiscal overseer or budget commission, the director of revenue may immediately appoint a receiver having all the powers and duties of a receiver appointed under § 45-9-7. Id.
As to the fourth tier of the Act, upon determining that the financial condition of the city or town has improved to a level that a fiscal overseer, budget commission, or receiver is no longer needed, a department of administration and finance shall be created for a period of five years. See § 45-9-10. The department of administration and finance is a municipal-level department and shall be under the control of an officer appointed by and reporting to the elected chief executive officer of the city or town. Id. The department of administration and finance shall be responsible for the "overall budgetary and financial administration of the city or town" and the preservation of the city or town's financial interest after having been restored to financial stability. Id.
In the instance that the receiver is unable to restore the city or town's fiscal stability, the Act provides for a fifth and final tier. Under § 45-9-7(b)(3), the receiver is authorized "to file a *Page 15 
petition in the name of the city or town under Chapter 9 of Title 11 of the United States Code, and to act on the city's or town's behalf in any such proceeding." Sec. 45-9-7(b)(3). Thus, should the receiver's powers be insufficient to resolve the city or town's fiscal crisis, the United States Bankruptcy Court is authorized to assume control over the matter. Id.
 IV Discussion A Judicial Estoppel
Under the doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position," the court may bar that party from assuming a contrary position, especially if it prejudices another party.New Hampshire v. Maine,532 U.S. 742, 749, 121 S. Ct. 1808, 1814 (2001). The doctrine prevents a party from asserting a claim in a proceeding that is inconsistent with a claim taken by that party in a prior proceeding.Id.; see also Chernick v. National Surety Co.,50 R.I. 419, 420, 148 A. 418, 419 (1930) (stating that judicial estoppel is an equitable principle employed to prevent injustice that may result from a litigant's inconsistency or fraud).
Judicial estoppel is an equitable doctrine that may be invoked by a court at its discretion. Maine,532 U.S. at 750, 121 S. Ct. at 1815 (quoting Konstantinidis v.Chen, 626 F.2d 933, 938 (D.C. Cir. 1980)) (stating that "because the rule is intended to prevent `improper use of judicial machinery' . . . judicial estoppel `is an equitable doctrine invoked by a court at its discretion'"); Gaumond v. Trinity RepertoryCo., 909 A.2d 512, 519 (R.I. 2006) (stating that the application of judicial estoppel is an extraordinary form of relief, applied only in instances where the equities are balanced in favor of the party seeking relief). Judicial estoppel differs from other forms of *Page 16 
estoppel in that it focuses on the relationship between the litigant and the judicial system as a whole rather than solely on the relationship between parties. Gaumond, 909 A.2d at 519 (citingD H Therapy Assocs. v. Murray,821 A.2d 691, 693 (2003) (noting that the doctrine of judicial estoppel is driven by the motive of promoting truthfulness and fair dealing in court proceedings).
In determining whether to apply judicial estoppel, courts will look to see whether: (1) a party's later position is inconsistent with its earlier position; (2) the party has persuaded a court to accept its earlier position such that acceptance of an inconsistent position in the later proceeding creates the perception that one of the courts has been misled; and (3) the party asserting an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.Maine, 532 U.S. at 750-51, 121 S. Ct. at 1815. Of these factors, unfair advantage is the primary factor relied upon by courts in invoking judicial estoppel.Id. at 751, 121 S. Ct. at 1815; Gaumond,909 A.2d at 520 (noting that judicial estoppel should be employed when a party is playing fast and loose with the courts and self-contradiction is being used as a means of obtaining an unfair advantage).
Here, the Receiver argues that having previously agreed to a Consent Order transitioning the judicial receivership to a non-judicial receivership, the Mayor and City Council should now be estopped from challenging the constitutionality of the Act. (Oct. 5, 2010 Tr. 11.; Joint Ex. G.) Conversely, the Mayor and City Council argue that they should not be estopped because the Consent Order was in no way a consent to the constitutionality of the Act.Id. at 80. In fact, they argue that both the Mayor and City Council were acting in good faith when they agreed to the Consent Order, and that it would be "totally inequitable to allow the [R]eceiver to assert judicial estoppel, when in fact, the Legislature passed a statute, the Legislature put the provision in [preventing] judicial receivers, and the City had no choice."Id at 82-84. *Page 17 
In New Hampshire v. Maine, relied upon by the Receiver, the United States Supreme Court applied judicial estoppel after having found that New Hampshire's subsequent claim as to the location of a border line was "clearly inconsistent" with its interpretation during a prior litigation. Id. at 751, 121 S. Ct. at 1815. In considering the equities, the Maine court determined that to accept New Hampshire's subsequent inconsistent interpretation, after "[h]aving convinced this Court to accept one interpretation . . . [and] having benefited from that interpretation," would allow New Hampshire to "gain additional advantage at Maine's expense" and would "undermine[] the integrity of the judicial process."Id. at 755, 121 S. Ct. at 1817.
Unlike the Supreme Court in Maine, this Court fails to recognize how the Mayor and City Council would derive unfair advantage or impose an unfair detriment upon the Receiver by challenging the constitutionality of the Act. In the instant matter, the Court runs no risk of inconsistent determinations by proceeding with a determination of the parties' constitutional challenge.Id. (applying judicial estoppel where "the risk of inconsistent court determinations would become a reality" were the court to accept the party's subsequent interpretation). Furthermore, where, as here, the Act explicitly prohibited judicial receiverships, the Court finds that the Mayor and City Council were not acting in bad faith when they petitioned the Court and should not be estopped from challenging its constitutionality.Gaumond, 909 A.2d at 520 (noting that judicial estoppel should be employed when a party is playing fast and loose with the courts and self-contradiction is being used as a means of obtaining an unfair advantage).
Moreover, the Court fails to see how the parties' assent to the Consent Order was either an affirmative representation about the constitutionality of the Act or an inducement causing reliance and injury to another. Southex Exhibitions, Inc. v. Rhode IslandBuilders Ass'n, 279 F.3d 94, 104 (1st Cir. 2002) (noting that in determining whether to apply judicial estoppel, *Page 18 
Rhode Island courts have also looked for (1) an affirmative representation by the party against whom estoppel is claimed; (2) for the purpose of inducing another to act or fail to act in reliance thereon; and (3) a showing of actual inducement of another causing injury). Where, as here, the Consent Order was merely a "formality" after the General Assembly passed the Act, the Court, in its discretion, finds that the Receiver has failed to establish that the Mayor or City Council made "clearly inconsistent" affirmative representations which induced reliance to the detriment of either the Receiver or the Court. Id.; Gaumond,909 A.2d at 519 (stating that judicial estoppel is an extraordinary form of relief, invoked in the court's discretion, and only applied when the equities are clearly balanced in favor of the party seeking relief). (Oct. 5, 2010 Tr. 83; Joint Ex. G.)
 B Constitutionality of the Act 1 The Right to Self-Government in All Local Matters
Article 13, Sections 1 and 2 of the Rhode Island Constitution grant the right of self-government in all local matters to the people of every city or town that has adopted a charter consistent with the Rhode Island Constitution and laws enacted by the General Assembly. In re Advisory Opinion to the House ofRepresentatives, 628 A.2d 537, 538 (R.I. 1993); R.I. Const. art XIII, §§ 1 and 2. Despite this delegation, Article 13, Section 4 of the Rhode Island Constitution reserves for the General Assembly, "the power to act in relation to the property, affairs and government of any city by general laws which shall apply alike to all cities and towns, but which shall not affect the form of government of any city or town." R.I. Const. art. XIII, § 4. Furthermore, the General Assembly is empowered to "act in relation to the property, *Page 19 
affairs and government of a particular city or town provided that such legislative action shall become effective only upon approval by a majority of the qualified electors of said city or town voting at a general or special election. . . ."[18]Id. (emphasis added).
Article 13, often referred to as the "Home Rule Amendment," altered the traditional rule that cities and towns have `no inherent right to self-government.'[19] Marran v. Baird,635 A.2d 1174, 1177 (R.I. 1994) (quoting In re AdvisoryOpinion, 628 A.2d at 538). Under the Home Rule Amendment, once a municipality adopts a valid home rule charter, [20] it is authorized to "enact and amend local laws relating to its property, affairs and government not inconsistent with this [C]onstitution and laws enacted by the [G]eneral [A]ssembly in conformity with the powers reserved to the [G]eneral [A]ssembly." R.I. Const. art. XIII, § 2. However, the legislative power conferred by Article 13 is not unfettered. Amico's Inc. v. Mattos,789 A.2d 899, 903 (R.I. 2002). Although municipalities are granted the right to self-government on a local level, legislation of matters of statewide concern is exclusively reserved for the General Assembly. Marran, 635 A.2d at 1177 (citing WesterlyResidents for Thoughtful Dev., Inc. v. Brancato,565 A.2d 1262, 1264 (R.I. 1989)) (stating that the power of the home rule is subordinate to the General *Page 20 
Assembly's power to legislate in matters of statewide concern). Thus, in light of Article 13, legislation by the General Assembly will infringe a municipality's right to self-government unless it applies alike to all cities and towns and addresses a matter of statewide concern.
 a Applies Alike to All Cities and Towns
The Mayor and City Council contend that the Act is unconstitutional because it violates Central Falls' right to self-government under Article 13, Sections 1 and 2. (Oct. 5, 2010 Tr. 85-86.) They claim that because the Act applied retroactively, it applied exclusively to Central Falls, and should have been subject to a vote of the electorate in accordance with the Home Rule Amendment. Id.; see also Mayor and City Council's Mem. of Law in Supp. of its Mot. for a Prelim. Inj. and TRO 10-11.
In Marran, our Supreme Court addressed a similar challenge to a prior version of the Act. The plaintiffs in Marran
asserted that the old version of the Act affected each municipality differently and therefore violated Article 13 because it did not apply alike to all cities and towns. In determining whether the old version of the Act "applied alike" or was directed at a specific city or town, Justice Lederberg focused on whether the Act "on its face" was "applicable to any city or town" and was thus "an act of general application." Marran, 635 A.2d 1177-78 (citingCity of East Providence v. Local 850, Int'l Ass'n ofFirefighters, AFL-CIO,117 R.I. 329, 338-339, 366 A.2d 1151, 1156 (1976)). Justice Lederberg, writing for the Court, held that the `critical fact [was] that the enabling legislation applie[d] equally to all cities and towns' on its face. Marran, 635 A.2d 1178 (quoting City ofCranston v. Hall, 116 R.I. 183, 186, 354 A.2d 415, 417 (1976). *Page 21 
Here, the Mayor and City Council similarly contend that the Act in its amended form affects Central Falls differently and therefore does not apply alike. (Oct. 5, 2010 Tr. 85-86.) However, the current version of the Act still does not facially discriminate between any particular city or town. In the "Declaration of Policy and Legal Standard," the Act clearly states that "[i]t shall be the policy of the state to provide a mechanism for the state to work with cities and towns undergoing financial distress" and "shall be carried out having due regard for the needs of the citizens of the state and of the city or town." Sec. 45-9-1. Although the Act may have applied retroactively[21] and affected Central Falls differently than other municipalities, on its face and by its terms the Act applies equally to all cities and towns, including Central Falls, and is therefore a statute of general application. But see McCarthy v.Johnson, 574 A.2d 1229, 1232 (R.I. 1990) (holding that the statute violated Article 13 because by its terms it failed to apply alike to all cities and towns).
 b Addresses an Issue of Statewide Concern
The Mayor and City Council also contend that the Act fails to address an issue of statewide concern. (Oct. 5, 2010 Tr. 87-88.) Thus, they claim that because the Home Rule Amendment grants them the right to govern purely local matters, when the Act was not presented for voter approval in accordance with Article 13, the General Assembly usurped Central Falls' right to self-government. Id.; see also Mayor and City Council's Mem. in Supp. of its Mot. for Prelim. Inj. and TRO 7-8, 11-12. *Page 22 
Although the Home Rule Amendment grants municipalities with valid home rule charters authority over purely local concerns, municipalities are not authorized to legislate on matters of statewide concern. Brancato, 565 A.2d at 1264. Furthermore, because the Constitution and General Laws are devoid of guidelines defining the parameters of "local" and "statewide" legislation, the court is delegated the responsibility of resolving the conflict.Bruckshaw v. Paolino, 557 A.2d 1221, 1223 (R.I. 1989). To determine whether a matter is of local or statewide concern, our Supreme Court considers whether: (1) uniform regulation throughout the state is necessary; (2) the matter is traditionally within the historical dominion of one entity; and (3) the municipality's action has a significant effect upon people outside the home-rule city or town. Town of East Greenwich v. O'Neil,617 A.2d 104, 111 (R.I. 1992). Most critical to the Court's determination is whether the municipality's action will significantly affect other cities and towns within Rhode Island.Id.
Accordingly, because the fiscal collapse of a municipality can affect the entire state's financial interests, the General Assembly has consistently recognized the importance of sound fiscal policies.Marran, 635 A.2d 1178-79. Thus, it is without question that uniform fiscal regulation is desirable and necessary to ensure that the state protects its own fiscal stability as well as that of its municipalities. See e.g.
G.L. 1956 § 45-52.1 (1991 Reenactment) (stating that the insolvency of Central Falls threatens the credit, health, and welfare of the entire state). Furthermore, the aggregate indebtedness and municipal budgets of cities or towns have historically been regulated by statutes of general application and subject to state oversight.Marran, 635 A.2d at 1179. Consequently, where, as here, Rhode Island has consistently exercised oversight over municipal budgets and debt obligations, the insolvency of a city or town threatens the credit of the state and other cities and towns, and uniform regulations are desirable *Page 23 
and necessary to protect the fiscal stability of the state and its municipalities, the Court finds that the Act affects matters of statewide concern and does not violate Central Falls' right to self-government.
 2 Alters a Municipality's Form of Government
The Mayor and City Council contend that the Act violates Article 13, Section 4 of the Rhode Island Constitution because it significantly alters a municipality's form of government by displacing appointed and elected officials.[22]
(Oct. 5, 2010 Tr. 94; Mayor and City Council's Mem. in Supp. of its Mot. for Prelim. Inj. and TRO 9-10.) In contrast, the Receiver avers that the Court should not address whether a change in the form of government has occurred because it is a non-justiciable political question. (Oct. 5, 2010 Tr. 26.) Further, should the Court deem it *Page 24 
appropriate to decide the issue, the Receiver argues that because the delegation of legislative authority under the Act is merely temporary and incidental, no change in the form of government has occurred. Id.
 a The Political Question Doctrine
The United States Supreme Court has held that the political question doctrine incorporates three inquiries: (1) does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of government; (2) would resolution of the question demand that a court move beyond areas of judicial expertise; and (3) do prudential considerations counsel against judicial intervention. Goldwater v. Carter,444 U.S. 996, 998, 100 S. Ct. 533, 534 (1979) (citing Baker v.Carr, 369 U.S. 186, 217, 82 S. Ct. 691, 710 (1962)). In considering justiciability, the court must decide whether the question before it is one of legislative power or of soundness of legislative policy. Gorham v. Robinson,57 R.I. 1, 8-9, 186 A. 832, 837-38 (1936) (stating that the question of whether a legislation is wise or unwise is a matter for the legislature, but the question of whether the legislation is in excess of legislative power is for the court to decide).
Under the Home Rule Amendment, "the [G]eneral [A]ssembly shall have the power to act in relation to the property, affairs and government of any city or town by general laws which shall apply alike to all cities and towns, but which shall not affect theform of government of any city or town." R.I. Const. art. XIII, § 4 (emphasis added). Here, the Mayor and City Council believe that although the Home Rule Amendment reserves legislative powers to the General Assembly, the Act exceeds those powers and violates Article 13 because it affects a municipality's form of government. As a result, the Court must determine whether the General *Page 25 
Assembly exceeded the scope of its powers by enacting legislation that alters a municipality's form of government.
Under the Rhode Island Constitution, the General Assembly has no right to alter or amend a municipality's form of government. Thus, in determining whether the Act violates Article 13, Section 4, the Court is not resolving an issue committed by text to the General Assembly nor is it addressing the soundness of the legislation's policy. Goldwater,444 U.S. at 998, 100 S. Ct. at 534; Gorham,57 R.I. at 8-9, 186 A. at 837-38.
Furthermore, resolution of the question is not beyond the judicial expertise of this Court. See Goldwater,444 U.S. at 998, 100 S. Ct. at 534. In Marran, our Supreme Court made an explicit determination regarding whether the old version of the Act impermissibly altered a city's form of government in violation of Article 13. 635 A.2d at 1178. The Supreme Court held that the pre-amended Act did "not expressly alter the structure or form of West Warwick's municipal government" because "any effect it may have [had] on a local government [was] contained, delineated, and temporary, lasting no longer than the end of the fiscal year."Id. In light of this, the Court finds that the determination is not beyond the expertise of this Court and further fails to recognize any prudential considerations counseling against a resolution of the Mayor and City Council's claim.Goldwater, 444 U.S. at 998, 100 S. Ct. at 534.
As a result, the Court finds that the political question doctrine does not apply to the Mayor and City Council's claim. The Court proceeds to address whether the Act exceeded the scope of the power reserved to the General Assembly by altering a municipality's form of government in violation of Article 13, Section 4. *Page 26 
 b Impact on the Municipality
Although the scope and breadth of the pre-amended version of the Act addressed in Marran was narrower than the current version of the Act, the standard applied by our Supreme Court in that case is applicable here. In Marran, the Supreme Court stated that the Act did not alter the structure or form of West Warwick's government because "any effect it may have [had] on a local government [was] contained, delineated, and temporary, lasting no longer than the end of the fiscal year." 635 A.2d at 1178. In its analysis, the Court determined that although the budget and review commission impacted the town's budgetary process, its effect was "at most incidental and temporary." Id.
Here, the Mayor and City Council claim that given the scope of the Receiver's powers, the Act — in its amended form — does more than merely affect a municipality's form of government, it displaces it. (Mayor and City Council's Mem. in Supp. of its Mot. for Prelim. Inj. and TRO 9-10.) However, although the Receiver's powers are broad and the receivership is not limited to a particular durational term, the Act does not permanently affect a municipality's form of government.
In fact, several provisions throughout the Act not only contemplate, but provide for the termination of the fiscal overseer, budget commission, and receiver. For example, § 45-9-10 clearly establishes the procedures for the appointment of an administration and finance officer upon the removal of a fiscal overseer, budget commission, or receiver. See § 45-9-10. The Act provides that an administration and finance officer will be appointed "upon a determination, in writing, by the director of revenue that the financial condition of the city or town has improved *Page 27 
to such a level that a fiscal overseer, a budget commission or a receiver is no longer needed."[23] Id.
Furthermore, despite the scope of the Receiver's power, § 45-9-7 explicitly states that the Director of Revenue, may at any time, and without cause, remove the Receiver and appoint a successor, or simply terminate the receivership entirely.See § 45-9-7. Moreover, § 45-9-7 also contemplates that elected officials are to remain in office serving in an advisory capacity, and that the municipality is to continue holding elections in anticipation that the receivership will eventually terminate.[24] Id.; see Marran, 635 A.2d at 1178 (stating that the municipality's form of government was not altered because the legislation's impact was incidental and temporary).
Although the Act places discretion in the hands of the Director of Revenue — particularly in light of §§ 49-9-7, 49-9-8 and 45-9-10 — it delineates sufficient standards to contain the Director of Revenue's actions and limit the Act's impact on a municipality.[25] Marran, *Page 28 
635 A.2d at 1178 (stating that the legislation did not unconstitutionally alter municipality's form of government where the impact was contained, delineated, and temporary). In fact, any action taken by the Director of Revenue or any official administering the Act, must be in accordance with the policy and standards stated in § 45-9-1.[26] In administering the provisions of the Act, an official may only act in relation to the fiscal well-being, public safety, or welfare of cities and towns, and the powers delegated are to be used to best preserve the safety and welfare of citizens of the state, their property, and access of the state and its municipalities to capital markets. See § 45-9-1.
Furthermore, §§ 45-9-3, 45-9-5, 45-9-6, 45-9-7, and45-9-8 delineate when a fiscal overseer, budget commission, or receiver should be appointed. Section 45-9-3(b) clearly outlines the factors the Director of Revenue must consider when determining whether a fiscal crisis exists. Additionally, these provisions contain explicit procedures explaining how a city or town moves from tier to tier throughout its fiscal instability. Although § 45-9-8 empowers the Director of Revenue to appoint a receiver without first appointing a fiscal overseer or budget commission, the Director of Revenue may do so only upon a declaration of fiscal emergency.[27] *Page 29 
Given the factors listed in § 45-9-3(b), the discretion of the Director of Revenue to declare a fiscal emergency is at a minimum constrained by these standards.[28]
As a result, in light of the standard established by our Supreme Court in Marran, the Court finds that the Act is sufficiently contained and delineated so as not to impermissibly alter a municipality's form of government.[29] Consequently, the General Assembly did not exceed its authority under Article 13, Section 4.
 3 The Separation of Powers Doctrine
The Mayor and City Council contend that the Act authorizes the Receiver to assume all the powers of the Mayor and City Council. (Mayor and City Council's Post Hearing Mem. 1.) Therefore, they argue that the Act violates the separation of powers doctrine.Id.
In an advisory opinion to the Governor, our Supreme Court has stated that "a constitutional violation of separation of powers [is] an assumption by one branch of powers that are central or essential to the operation of a coordinate branch." In re Advisory Opinionto the Governor, 612 A.2d 1, 18 (R.I. 1992); seealso East Greenwich, 617 A.2d at 107 (stating that "the separation of powers doctrine prohibits the usurpation of the power of one branch of *Page 30 
government by a coordinate branch of government"). However, our Supreme Court has stated that while previously the lines between coordinate branches of government were "broadly and clearly defined," under modern interpretation, "some degree of blending of departmental powers" is required as long as there is not an assumption of the whole power of another department.Id. at 18-19.
Here, the General Assembly has delegated to the Director of Revenue the power to resolve fiscal instability at a state and municipal level. Although the powers of the Receiver combine those of the Mayor and City Council, those powers are restrained and limited by the policy and standards set for in § 45-9-1. Moreover, in administering the provisions of the Act, the Receiver is merely acting upon and within the legislative powers delegated to him by the General Assembly. See Milardo v. CoastalRes. Mgmt. Council, 434 A.2d 266, 271 (R.I. 1981) (stating that the exercise of a combination of governmental powers has been upheld with respect to administrative agencies and has been consistently recognized as constitutional); Davis v. Woods,427 A.2d 332, 336 (R.I. 1981) (stating that "[a]s long as the Legislature that creates the agency demonstrates standards or principles to confine and guide the agency's power" the court should sustain the delegation).
Moreover, regardless of the fact that modern separation of powers doctrine is not strictly applied, separation of powers is not even guaranteed on the municipal level. See East Greenwich,617 A.2d at 107 (stating that because a city or town is a creature of the state and the city or town council is not a coordinate branch of state government, separation of powers is not implicated on the municipal level); Board of County Comm'rs of Bernalillo v.Padilla, 111 N.M. 278, 283, 804 P.2d 1097, 1102 (N.M. App. 1990) (stating that the state guarantee of separation of powers does not apply to the distribution of power within local governments because the *Page 31 
threat of an unchecked governing body is slight where the body is subordinated to the powers of a higher level of government);Bottone v. Town of Westport,209 Conn. 652, 553 A.2d 576 (1989) (stating that because a municipality is not one of the departments enumerated in the state constitution's separation of powers provision, the separation of powers doctrine does not apply to municipalities); 2A McQuillinMun. Corp. § 10:3 (3d ed. 2010) (noting that historically the constitutional principle of the separation of powers has not been applied to the government of cities). Therefore, in light of our Supreme Court's statements that a violation of separation of powers occurs when one branch assumes the powers of a coordinate branch, and that a city council is not a coordinate branch of the state government, the Court finds that the Act does not implicate or violate the separation of powers doctrine. Advisory Opinion tothe Governor, 612 A.2d at 18; See East Greenwich,617 A.2d at 107.
 4 Overbreadth and the Non-delegation Doctrine
The Mayor and City Council claim that the delegation of power to the Receiver pursuant to § 45-9-7 is unreasonable because it fails to delegate a "clear and precisely defined function." (Mayor and City Council's Mem. of Law in Supp. of its Mot. for a Prelim. Inj. and TRO 13-14.) They contend that given the broad scope of powers delegated to the Receiver under § 45-9-7, the Receiver's powers are unlimited, are without an intelligible standard or principle, and will breed arbitrary and capricious actions.Id.
Unrestricted delegations of legislative power by the General Assembly are forbidden by the Rhode Island Constitution.Marran, 635 A.2d at 1179 (citing Milardo, 434 A.2d at 270). This prohibition, known as the non-delegation doctrine, is derived from Article 6, Sections 1 and 2 of the Rhode Island Constitution.Milardo, 434 A.2d at 270. These sections provide that the *Page 32 
Rhode Island Constitution "shall be the supreme law of the state and that the legislative power thereunder shall be vested in two houses of the Legislature." Davis, 427 A.2d at 335. The non-delegation doctrine is intended to protect citizens against discriminatory and arbitrary actions of public officials and ensures that politically accountable officials make fundamental policy decisions. Marran, 635 A.2d at 1179.
Although the Constitution has been interpreted to forbid unconditional delegations of legislative power, our Supreme Court has recognized that modern problems of ever-increasing complexity require administrative expertise[30] and that strict adherence to the non-delegation doctrine "would detrimentally inhibit the Legislature's ability to execute its constitutional duties."Id. (stating that non-delegation doctrine should not be so strictly applied that it inhibits the General Assembly's ability to execute its constitutional duties); Milardo,434 A.2d at 270-71 (stating that delegation of legislative functions is not per se unconstitutional in light of the need for administrative expertise in the discharge of certain legislative functions). Accordingly, our Supreme Court has held that "reasonable delegations" of legislative power to administrative bodies and agents shall be permitted. Id.
According to Justice Lederberg in Marran, "a delegation is reasonable, and thus constitutional, `as long as the Legislature that creates the agency demonstrates standards or principles to confine and guide the agency's power.' In making this determination, `we must read the act as a whole.'" 635 A.2d 1179 (citing Davis, 427 A.2d at 336). TheMarran court further explained that `it is the conditions of the delegation — the specificity of the functions delegated, the standards accompanying the delegation, and the safeguards against administrative *Page 33 
abuse — that we examine in determining the constitutionality of a delegation of power.' Id.
(citing Milardo, 434 A.2d at 271). As long as the statute "declares a legislative purpose, establishes a primary standard for carrying out the [delegation], or lays out an intelligent principle to which an administrative officer must conform," the court should sustain the delegation. Davis, 427 A.2d at 336.
With regards to the standards accompanying the delegation of power to the Receiver, § 45-9-1 clearly delineates the policy and standards by which the Receiver or any official administering the provisions of the Act are controlled. As previously discussed, under the Act, the Receiver is only empowered to act in relation to the fiscal well-being, public safety, and welfare of cities and towns within Rhode Island. Furthermore, any action by the Receiver must be carried out with "due regard for the needs of the citizens of the state and of the city or town, and in such a manner as will best preserve the safety and welfare of citizens of the state . . . their property, and the access of the state and its municipalities to capital markets. . . ." Sec. 45-9-1.
In light of the general directives upheld by our Supreme Court inDavis, 427 A.2d at 336 (holding that the directive "that activities relating to management of solid waste be conducted in an environmentally sound manner" was a sufficiently intelligible standard), and J.M. Mills, Inc. v. Murphy,116 R.I. 54, 63-63, 352 A.2d 661, 666 (1976) (holding that the requirement that the director act in the "best public interest" was a sufficient standard to confine and guide the agency's discretion), this Court finds that § 45-9-1 similarly provides a sufficiently intelligible standard to confine and guide the Receiver's authority.See Milardo, 434 A.2d at 270 (stating that upon delegation, administrative agents must have flexibility to effectuate the purposes of the legislation). *Page 34 
Furthermore, with regards to the specificity of the functions delegated to the Receiver in § 45-9-7, given the fiscal emergency facing the municipality at the receivership level, flexibility in the authority and functions of the Receiver is necessary to ensure the municipality is effectively returned to fiscal stability.Milardo, 434 A.2d at 270. Moreover, any action taken by the Receiver under § 45-9-7 is sufficiently confined by the "Declaration of Policy and Legal Standard" in § 45-9-1. DePetrillo v.Coffey, 118 R.I. 519, 523, 376 A.2d 317, 319 (1977) (holding that our Supreme Court subscribes to the view that the General Assembly's delegation of its legislative power will be deemed reasonable and lawful if it is limited by standards sufficient to confine the exercise of that power for the purpose for which the delegation was made). Additionally, § 45-9-16 of the Act guides the Court by providing that "[t]his chapter being necessary for the welfare of the state and its inhabitants shall be liberally construed in order to effectuate its purposes." Sec. 45-9-16. As such, the Act clearly provides that the purposes stated in § 45-9-1 should serve as a guiding principle for the Receiver and the court in interpreting and administering the Act's provisions.Thompson v. Town of East Greenwich,512 A.2d 837, 842 (R.I. 1986).
The Act also provides for sufficient safeguards to protect against arbitrary actions. As previously discussed, officials administering the Act must rely on the standards of §§ 45-9-3, 45-9-5, 45-9-6, 45-9-7, 45-9-8, and 45-9-10 as triggering points before determining whether a fiscal crisis exists or appointing or terminating a fiscal overseer, budget commission, or receiver. Moreover, despite the Mayor and City Council's concern regarding the scope of the Receiver's authority, under § 45-9-7 the Director of Revenue is specifically authorized, at any time, and without cause, to remove the Receiver and appoint a successor or terminate the receivership.See § 45-9-7. *Page 35 
Although the Receiver is not subject to a term limit or a reporting requirement, the Director of Revenue is a sufficient safeguard to protect against arbitrary actions.
Accordingly, in light of the policy and standards of § 45-9-1, the five-tiered mechanism establishing clear guidelines for administration, and the oversight provided by the Director of Revenue and the Judiciary, [31] when read as a whole, the Court finds that the Act is a reasonable delegation by the General Assembly of its legislative powers and sufficiently guards against arbitrary and unconstrained actions. Milardo,434 A.2d at 272 (holding a delegation reasonable in light of the necessity of agency expertise, the specificity of the functions delegated, the standards accompanying the delegation, and the safeguards against administrative abuse).
 5 Substantive Due Process
The Mayor and City Council claim that § 45-9-7 violates substantive due process because the delegation of such vast powers to the Receiver shocks the conscience. (Mayor and City Council's Mem. of Law in Supp. of its Mot. for a Prelim. Inj. and TRO 16-17.) They further argue that the lack of standards or guidance within the Act, combined with the broad delegation of power to the Receiver, allows the Receiver to act arbitrarily and capriciously in violation of substantive due process. (Mayor and City Council's Supplemental Mem. of Law in Supp. of their Mot. for TRO 15-17.) Conversely, the Receiver maintains that under the "Declaration of Policy and Legal Standard," the General Assembly demonstrated sufficient standards or principles to confine and guide the Receiver's power. (Receiver's Reply to Supplemental Mem. in Supp. of Moreau, City Council, and Benson's Mot. for Injunctive Relief 7-8.) Furthermore, the Receiver contends that both the Act's "Declaration of Policy and Legal Standard" and the *Page 36 
multi-tiered approach are sufficient to establish that the legislation is not arbitrary and capricious. Id.
Substantive due process is grounded in Article 1, Section 2 of the Rhode Island Constitution which provides that "[a]ll free governments are instituted for the protection safety, and happiness of the people. All laws, therefore, should be made for the good of the whole; and the burdens of the state ought to be fairly distributed among its citizens. . . ." R.I. Const. art. I, § 2. Substantive due process guards against arbitrary and capricious government action. Brunelle v. Town of South Kingstown,700 A.2d 1075, 1084 (R.I. 1997); L.A. Ray Realty v. Town Councilof Cumberland, 698 A.2d 202, 211 (citing PFZ Props.,Inc. v. Rodriguez, 928 F.2d 28, 31-32 (1st Cir. 1991)) (stating that substantive due process prevents governmental abuse of power that shocks the conscience and government action not rationally related to a legitimate state interest). To establish a substantive due process violation, a party must show that the challenged provision is clearly arbitrary and unreasonable, having no substantial relation to public health, safety, morals, or general welfare. Kaveny v. Town of Cumberland Zoning Board ofReview, 875 A.2d 1, 10 (R.I. 2005).
Where, as here, the Act explicitly states that "[t]his chapter is necessary for the welfare of the state," the Court finds that the Act has a substantial relation to proper legislative purposes.See § 45-9-16; Kaveny, 875 A.2d at 10-11 (stating that the act has a substantial relation to proper legislative purposes where the Legislature declared that the provisions of the act are necessary to assure the health, safety, and welfare of all citizens of the state). Furthermore, in light of the Court's previous determinations regarding the sufficiency and effect of the "Declaration of Policy and Legal Standard" and the multi-tiered structure of the Act, the Court declines to find *Page 37 
that the Act's delegations of power either shock the conscience, are arbitrary and capricious, or violate substantive due process.
 a Vagueness
The Mayor and City Council also argue that the Act is unconstitutional because it is "vague, undefined, and unconfined." (Mayor and City Council's Supplemental Mem. of Law in Supp. of their Mot. for TRO 17-18; Oct. 5, 2010 Tr. 117-121.) They claim that the Act violates substantive due process because it fails to delineate or suggest any standards to protect against arbitrary or unfettered discretion. Id.
Our Supreme Court has held that a statute is unconstitutionally vague if it compels a person of average intelligence to guess and to resort to conjecture as to its meaning and application.Kaveny, 875 A.2d at 10; see also Fitzpatrick v. Pare,568 A.2d 1012, 1013 (R.I. 1990) (citing United NuclearCorp. v. Cannon, 553 F. Supp. 1220, 1235 (D.R.I. 1982)) (stating that a statute is unconstitutionally vague if it fails to delineate or suggest any standards or delegate rule-making powers sufficient to provide the omitted standards); Grayned v. City ofRockford,408 U.S. 104, 108-09, 92 S. Ct. 2294, 2298-99 (1972) (noting that a statute lacking explicit standards and enabling officials to act arbitrarily and with unchecked discretion is unconstitutionally vague). Moreover, the court uses a less stringent standard to determine vagueness of a non-criminal statute.Fitzpatrick, 568 A.2d at 1013 (stating that the standard used by the court to determine vagueness of a statute is dependent upon the nature of the statute).
In Fitzpatrick, relied upon by the Mayor and City Council, our Supreme Court declared that a statute requiring suspension of a driver's license in cases of accidents involving death or personal injury was unconstitutionally vague because it "fail[ed] to set forth any standard to be *Page 38 
used when determining if the driver's license should be revoked" and would result in arbitrary enforcement. 568 A.2d at 1013-14. However, in light of the fact that the Court has already determined that §§ 45-9-1, 45-9-3, 45-9-5, 45-9-6, 45-9-7, 45-9-8, and45-9-10 sufficiently delineate the policy and standards for administration of the Act, the factors for determining whether a fiscal crisis exists, and the conditions and procedures for the appointment or termination of a fiscal overseer, budget commission, or receiver, the Court finds that the Act is not impermissibly vague.
 6 Procedural Due Process
Under the Rhode Island Constitution, procedural due process protections are grounded in Article 1, Section 2 which states that "[n]o person shall be deprived of life, liberty, or property without due process of law. . . ." R.I. Const. art. I, § 2. Procedural due process ensures that notice and an opportunity to be heard precede any deprivation of a person's life, liberty, or property. Cleveland Bd. of Educ. v. Loudermill,470 U.S. 532, 542, 105 S. Ct. 1487, 1493 (1985); Board ofRegents v. Roth,408 U.S. 564, 569-70, 92 S. Ct. 2701, 2705 (1972) (stating that procedural due process requires some kind of hearing prior to the deprivation of a constitutionally protected property interest). The applicability of procedural due process depends on the presence of a constitutionally protected property or liberty interest.Sweeney v. Tucker,473 Pa. 493, 523, 375 A.2d 698, 712 (1977) (stating that the court should only determine what due process is required when a legitimate property interest exists).
The Mayor and City Council claim that the Act violates procedural due process because it essentially removed them from office, without prior notice or a hearing. (Mayor and City Council's Supplemental Mem. of Law in Supp. of their Mot. for TRO 10-11.) Furthermore, they *Page 39 
claim that the removal of an elected official in this manner, absent notice and a hearing, is a deprivation of their constitutionally protected property rights and is in contravention of our Supreme Court's prior holdings. Id.; seealso Oct. 5, 2010 Tr. 121-24. The Receiver argues that the Act does not violate procedural due process because neither the Mayor nor the City Council has been removed from office. (Oct. 5, 2010, Tr. 48.) Moreover, the Receiver claims that neither the Mayor nor the City Council has a fundamental right or property interest in their offices. Id. at 47-49.
 a Removal of the Mayor and City Council
In light of the Court's determination that the Act does not have a permanent effect on a municipality's form of government, the Mayor and City Council's procedural due process claims must fail. Despite their contentions, the Mayor and the City Council have not been removed from office, but are temporarily acting in an advisory capacity to the Receiver. See § 45-9-7(c); Joint Exs. K L. Although to date, the Receiver has not deferred to the Mayor for advice, the Receiver explained that he has yet to find "a situation in which he thought . . . that it was necessary to seek [the Mayor's] advice." (Oct. 5, 2010 Tr. 46.)
Furthermore, the Court finds the Mayor and City Council's reliance on Hansen v. Board of Educ. of Sch. Dist. No. 65,150 Ill. App.3d 979, 502 N.E.2d 467 (1986), to be misplaced. The Mayor and City Council rely on Hansen to show that by placing them in an advisory capacity, the Receiver has effectively "removed" them from office. In Hansen, the Appellate Court of Illinois found that a tenured public school teacher who had been stripped of his teaching duties and reassigned to a position as a full-time proctor, had effectively been dismissed under the tenure provision of the Illinois School Code, and was thus entitled to the notice and hearing *Page 40 
requirements of the code. Id. at 986, 502 N.E.2d at 472.Hansen, however, is distinguishable from the instant matter. While the teacher in Hansen was permanently reassigned, both the Mayor and City Council remain in an advisory capacity for only as long as the receivership is in place. As previously indicated, the Act clearly dictates that general elections are to continue and expressly contemplates termination of the receivership when the fiscal stability of the municipality is restored.See §§ 45-9-7 45-9-10.
Moreover, unlike the tenured teacher who was totally stripped of his teaching duties, neither the Mayor nor the City Council has been entirely stripped of their government functions. Although the powers assumed by the Receiver are superior to those of the Mayor and City Council, throughout the receivership, they remain in an advisory capacity to the Receiver, who may defer to them for action and advice in an appropriate situation.[32]
(Oct. 5, 2010 Tr. 46.) Whereas the Illinois Appellate Court deemed the teacher's reassignment to be the equivalent of a removal in light of the purpose and policy of the tenure provision of the Illinois School Code, this Court does not view the Mayor or City Council's advisory status as a removal in light of the General Assembly's policy and purpose under the Act.
 b Property Interest
Having decided that neither the Mayor nor the City Council has been removed from office, for purposes of discussion, the Court will address whether the Mayor or City Council has a property interest as elected officials. The Mayor and City Council claim that the removal of an elected official, absent notice and a hearing, is in explicit contravention of our Supreme Court's *Page 41 
prior holdings.[33] See Doris v. Heroux,71 R.I. 491, 494, 47 A.2d 633, 635, (1946), Brule v. Board ofAldermen of Central Falls,54 R.I. 472, 473, 175 A. 478, 479 (1934), and McCarthy v. Boardof Aldermen of Central Falls,38 R.I. 385, 386, 95 A. 921, 923 (1915). However, these cases are distinguishable.
Here, the Mayor and City Council were elected by the general electorate of Central Falls. In contrast, in Doris,Brule, and McCarthy, the officials claiming procedural due process violations, were not elected by the public, but were appointed officials, chosen by the city council or board of aldermen. The United States Supreme Court has expressly stated that public officials chosen by the general electorate serve at the will of the people and do not have a property interest in elected office. Taylor v. Beckham,178 U.S. 548, 576-77, 20 S. Ct. 890, 900 (1900) (stating that public offices such as the governorship are mere agencies or trusts and not property because of "the nature of the relation of a public officer to the public"); Snowden v. Hughes,321 U.S. 1, 7, 64 S. Ct. 397, 400 (1944) (affirming Taylor and stating that a senatorial candidate does not have a property interest in elected office that is secured by due process).
Elected public officials such as the Mayor and City Council hold office for the benefit of the citizens of Central Falls and do not have an entitlement to their office. Sweeney,473 Pa. at 524, 375 A.2d at 713 (stating that because an elected member of the legislature holds office for the benefit of his constituents, the public interest in the office far outweighs any private interest or expectation in holding the office); seealso 3 McQuillin Mun. Corp. § 12.117 (3d ed. 2010) (stating that under our system of government, elected office is not held by grant or contract, and *Page 42 
no person has a private property or vested right or interest in them). As a result, had the Mayor and City Council actually been removed, the Court finds it questionable whether they would have been entitled to procedural due process requirements.
 C Edna Poulin's Appointment to the CFHA
Having determined that the Act is constitutional, the Court now addresses the Receiver's appointment of Edna Poulin to the CFHA. In addition to the powers granted to the fiscal overseer and budget commission under §§ 45-9-2 and 45-9-6, [34] upon appointment the Receiver is also empowered:
 "to exercise any function or power of any municipal officer or employee, board, authority, or commission, whether elected or otherwise relating to or impacting the fiscal stability of the city or town including, without limitation, school and zoning matter." Sec. 45-9-7(b)(1).[35] *Page 43 
Under a plain reading of this unambiguous provision, the Act authorizes the Receiver to assume the functions or powers of any municipal officer or employee, board, authority, or commission, whether they be elected or otherwise relating to or impacting the fiscal stability of the city or town. As a result, the Court concludes that under the terms of the Act, the power of the Receiver is not limited to exercising functions or powers solely related to fiscal stability, but in fact allows for the assumption of powers whether they are of an elected official or relate to the fiscal stability of a city or town.[36]
Accordingly, when the Receiver appointed Edna Poulin to the CFHA, he was simply exercising the Mayor's power to appoint commissioners under G.L. 1956 § 45-25-1 et seq. In fact, § 45-25-10 provides that each city housing authority shall "consist[] of five (5) commissioners appointed by the mayor. . . ." G.L. 1956 § 45-25-10. The Mayor is authorized to appoint each commissioner for a specified term and to fill vacancies for the remainder of the unexpired term. Id. Each commissioner is entitled to hold office until his or her successor has been appointed or elected, and has been qualified. Id. A commissioner is qualified after the Mayor files with the city clerk a certificate of appointment or reappointment, which serves as conclusive evidence of due and proper appointment of the commissioner. Id. *Page 44 
Here, after assuming the Mayor's powers in accordance with § 45-9-7, on September 13, 2010, the Receiver appointed Edna Poulin as a successor to Milad Shabo, whose term had expired on April 1, 2010. See Joint Exs. N O. Accordingly, as a holdover, Milad Shabo was only entitled to hold office until a successor had been appointed and qualified.[37]See § 45-25-10. Where, as here, the Receiver properly appointed and qualified Edna Poulin as a successor to Milad Shabo, the Court finds that the Receiver's actions were proper and in accordance with the Mayor's powers under § 45-25-10.[38]
Additionally, the Receiver's actions were within the scope of the "Declaration of Policy and Legal Standard." Sec. 45-9-1. As previously discussed, an official administering the Act is limited to acting for the fiscal well-being, public safety, and welfare of a distressed city or town, and must act solely to "best preserve the safety and welfare of citizens . . . their property, and the access of the state and its municipalities to capital markets, all to the public benefit and good." Id. Where, as here, the General Assembly has expressly stated that the establishment of a housing authority and commissioners is "in the public interest" and is necessary to prevent "an *Page 45 
increase in and spread of disease and crime," the Court finds that the Receiver was acting within the scope of the policy and standards of § 45-9-1[39] when he appointed Edna Poulin to the CFHA and was not acting arbitrarily or capriciously.[40]See § 45-25-2. *Page 46 
 D Injunctive Relief
By agreement, and pursuant to Rule 65, the parties consolidated their requests for preliminary and permanent injunctions during the October 5, 2010 hearing. See Super. R. Civ. P. 65. A party seeking injunctive relief must demonstrate (1) a reasonable likelihood of success on the merits; (2) a threat of irreparable harm that is presently threatened or imminent and for which there is no adequate remedy of law; and (3) a balancing of the equities that favors the moving party. Fund for Cmty. Progress v. UnitedWay of Se. New England, 695 A.2d 517, 521-22 (R.I. 1997);Iggy's Doughboys, Inc. v. Giroux,729 A.2d 701, 705 (R.I. 1999).
Further, in addressing a request for a permanent injunction, the Court must determine whether "the merits of the case call for an order forbidding or compelling particular conduct." See
Robert B. Kent et al., Rhode Island Civil and AppellateProcedure § 65:1 (West 2006). A party seeking injunctive relief `must demonstrate that it stands to suffer some irreparable harm that is presently threatened or imminent and for which no adequate legal remedy exists to restore that plaintiff to its rightful position.' National Lumber Bldg. MaterialsCo. v. Langevin, 798 A.2d 429, 434 (R.I. 2002) (quotingUnited Way, 695 A.2d at 521). "Irreparable injury must be either `presently threatened' or `imminent'; injuries that are prospective only and might never occur cannot form the basis of a permanent injunction." Id. (quoting Rhode IslandTpk. Bridge Auth. v. Cohen, 433 A.2d 179, 182 (R.I. 1981)). The issuance of an injunction and the scope of the relief granted rests in the Court's discretion. DeNucci v. Pezza,114 R.I. 123, 130, 329 A.2d 807, 811 (1974); United Way,695 A.2d at 521-22.
Having now considered the merits of the Receiver's case, and in light of the Court's determinations contained herein, the Court finds that the Receiver is entitled to injunctive relief. *Page 47 
Given the General Assembly's statement that the Act is "necessary for the welfare of the state and its inhabitants," as well as theMarran court's finding that the fiscal collapse of a municipality can affect the entire state's financial interest, the Court finds that irreparable harm will result if the Mayor and City Council are not enjoined from making further appointments, and the Receiver is hindered from administering the Act.See § 45-9-16; Oct. 5, 2010 Tr. 68-69.
In considering the equities of the case, the Court examines the hardship to the moving party if the injunction is denied, the hardship to the opposing party if the injunction is granted, and the public interest in granting or denying relief. United Way,695 A.2d at 521-22. In the instant matter, should Central Falls' fiscal instability continue, any harm to the Mayor or City Council that would result from an injunction, is far outweighed by the harm to the Receiver in administering the Act, to Central Falls, and to Rhode Island.
As a result the Court grants the Receiver's request for a permanent injunction and enjoins: (1) the Mayor and City Council and each of its members from making any appointments to the CFHA, including those of Milad Shabo and Gladys Burns; (2) the Mayor and City Council and each of its members from making any appointments to the Central Falls Detention Center Corporation, including those of Clarise Thompson and Shawne Thomas; (3) the Mayor and City Council and each of its members from interfering with the acts of the Receiver in his capacity as receiver; and (4) the Mayor and City Council and each of its members from acting in contravention of the Act.
 V Conclusion
After due consideration of all the evidence, together with the arguments advanced by counsel at the hearing and in their memoranda, the Court finds that the Act is constitutional and *Page 48 
that the Receiver did not exceed the scope of his authority in appointing Edna Poulin to the CFHA. As a result, the Court holds that the Act applies alike to all cities and town, addresses a statewide concern, does not alter a municipality's form of government, and is substantially related to public welfare. Furthermore, the Court holds that the "Declaration of Policy and Legal Standard" and the five-tiered mechanism delineated within the Act provide sufficient standards, principles, and safeguards by which to guide the administration of the Act and prevent against arbitrary and capricious actions. Additionally, the Court holds that neither the Mayor nor the City Council has been removed from office and that they have failed to establish a claim for procedural due process. Having determined that the Receiver was acting within the authority granted by §§ 45-9-7, 45-25-10, 45-26-4, and by Central Falls' Home Rule Charter, the Court finds that the Receiver's appointment of Edna Poulin to the CFHA is proper and valid. Lastly, having satisfied the elements for a permanent injunction, the Court grants the Receiver's request for injunctive relief.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] The Attorney General, pursuant to G.L. 1956 § 42-9-1 et seq., also participated in these proceedings.
[2] Said Consent Order was signed by counsel representing the State of Rhode Island, the Mayor (in his official capacity as Mayor), and the City Council.Id. ¶ 18. Prior to seeking the Consent Order, the City Council passed a Resolution on June 17, 2010, joining the Mayor in his decision to authorize the dismissal of the pending Superior Court receivership and to transition to a "[s]tate [r]eceiver, with the power to petition the City into Chapter 9 bankruptcy [and] possess[ing] essentially the same powers as the Superior Court Receiver." See Joint Ex. F.
[3] Pfeiffer also informed Moreau that he was reducing his salary of $71,736 to $26,000 and was terminating Personnel Director Gene R. Noury. Id. ¶ 20; see Joint Ex. L.
[4] Milad Shabo was holdover commissioner whose term expired on April 1, 2010. See Joint Ex. N.
[5] Prior to rescinding these resolutions, the City Council was not afforded a hearing or an opportunity to be heard.Id. ¶ 23.
[6] That matter, Central Falls Hous. Auth. v. Pfeiffer, No. 10-5580 (R.I. Super. Ct. Sept. 22, 2010), was not consolidated with the instant action.
[7] At a hearing held on October 4, 2010, the Court admittedde bene esse the Affidavits of Charles D. Moreau and Gene R. Noury, as well as portions of the Affidavit of City Council President William Benson, Jr.; these affidavits are now admitted as full exhibits.
[8] In its pre-amended form, the Act provided a more limited mechanism by which to deal with a city or town's fiscal crisis. The Act originally vested the director of the state department of revenue with the power to
 "authorize, create, and establish a budget and review commission in any town or city where the director finds that the town or city's bond rating has been assigned by one or more recognized rating agencies to a rating which is below investment grade and there is an imminent threat of default on any or all of its obligations." G.L. 1956 § 45-9-3 (amended 2010).
Furthermore, the Act in its pre-amended form specified the composition of the budget and review commission and granted it the power
 "to impose taxes and to make appropriations for the expenditures of moneys, for the purpose of adopting a budget and, for the purpose of maintaining a balanced budget, the budget and review commission shall make reductions or suspensions in the appropriations to any or all departments, offices, or other agencies of town or city government as will prevent a deficit for the fiscal year." Sec. 45-9-3(a)(9) (amended 2010).
Additionally the budget and review commission would remain in office until "that time as the chief executive officer of the town or city and the town or city council petitions the director of the state department of revenue to disband the budget and review commission."Id. Within ninety days of being disbanded, the budget and review commission was required to approve and issue a report detailing its findings and recommendations.See § 45-9-3(b)(2) (amended 2010).
[9] The text of any General Law, or reenactment thereof, does not include the title or chapter heading or the boldface captions appearing at the beginning of the sections, except as necessary for clarification of statutory text. See
G.L. 1956 § 43-4-18.
[10] In construing the provisions of the Act, the General Assembly provided that "[the Act] being necessary for the welfare of the state and its inhabitants shall be liberally construed in order to effectuate its purposes." Sec. 45-9-16. Furthermore, "[n]otwithstanding any general or special law to the contrary, unless otherwise specified, the provisions of [the Act] shall supersede any conflicting provisions of the city's or town's charter or local ordinance." Sec. 45-9-12. "Insofar as the provisions of [the Act] are inconsistent with the provisions of any charter or other laws or ordinances, general, special, or local, or of any rule or regulation of the state or any municipality, the provisions of [the Act] are controlling." Sec. 45-9-15.
[11] Under § 45-9-5(g), the chief executive officer of a city or town and city or town council may also jointly request approval from the division of municipal finance, the director of revenue, and the auditor, for the establishment of a budget commission.See § 45-9-5(g).
[12] If a budget commission has not been appointed and the division of municipal finance determines that the city or town has taken the necessary steps to achieve long-term fiscal stability — no longer requiring active state oversight — the director of revenue may abolish the fiscal overseer in accordance with § 45-9-5(e).
[13] The budget and review commission consists of five members: three being appointed by the director of revenue, one being the chief executive officer of the city or town, and the last being the president of the city or town council. The budget and review commission is empowered to act by a majority vote of all its members. See § 45-9-6.
[14] The budget commission is subject to the "Access to Public Records" and "Code of Ethics" requirements of the General Laws. When meeting to take action on (1) levy and assessment of taxes; (2) rulemaking or suspension of rules; (3) adoption of a municipal budget; (4) collective bargaining agreements; or (5) making a determination that its powers are insufficient to restore fiscal stability, the budget commission is subject to the "Open Meetings" requirements of the General Laws.See § 45-9-6.
[15] Among these delegations is the power to: (1) amend, formulate, and execute the annual municipal budget; (2) develop and maintain a uniform system for all financial planning; (3) appoint, remove, supervise, and control all city and town employees and have control over all personnel matters other than disciplinary matters; (4) alter or eliminate compensation and/or benefits of elected officials of the city or town to reflect the fiscal emergency and changes in the responsibility of the officials; (5) reorganize, consolidate or abolish departments, commissions, boards, offices, or functions of the city or town, and remove or appoint new members in connection therewith; (6) alter or rescind any action or decision of any municipal officer, employee, board authority, or commission within fourteen days after notice of action or decision; and (7) exercise all powers under the General Laws and this chapter or any special act, any charter provision, or ordinance that any elected official of the city or town may exercise. See § 45-9-6(d).
[16] The Court notes that while the duration of the budget commission is at the discretion of the director of revenue, all officials administering the powers delegated under the Act must act in accordance with the policy stated in § 45-9-1 and in light of the standards for fiscal instability provided in § 45-9-3.
[17] The director of revenue may, at any time, and without cause, remove the receiver and appoint a successor, or terminate the receivership. See § 45-9-7. Additionally, the Act limits a city or town's access to receivership proceedings, providing that "[n]o city or town shall be placed into, or made subject to, either voluntarily, or involuntarily, a judicial receivership proceeding." Sec. 45-9-13.
[18] In essence, the General Assembly "can act only in relation to the property, affairs, and government of any home-rule city or town by the General Laws when such legislation pertains to all cities and towns alike and does not affect the form of government of any home-rule city or town." In re Advisory Opinion,628 A.2d at 538. When an act of the General Assembly is directed to only one home-rule city or town, the approval of a majority of the qualified electors of that city or town in a general or special election is necessary. Id.
[19] The Home Rule Amendment becomes effective in a city or town only after a charter is presented and accepted by the city or town.In re Advisory Opinion, 628 A.2d at 538 (citing Lynch v.King, 120 R.I. 868, 391 A.2d 117 (1978)). Until a charter is approved, the city or town remains subject to the plenary power of the General Assembly. Id.
[20] Central Falls adopted its Home Rule Charter in 1952. Pursuant to Article 1 of the Charter, the City reserves to itself "all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions, including any additional powers and authority which may hereafter be granted to it." Central Falls Home Rule Charter, art. I, § 1-100 (1951).
[21] The Court notes that had the General Assembly passed the Act without the retroactive provision, Central Falls likely would have remained in a judicial receivership, and the Act — prohibiting all judicial receiverships — would have violated Article 13 by not applying alike to all cities and towns. (Oct. 5, 2010 Tr. 86.)
[22] Under § 45-9-7(b), the Receiver shall have the following powers:
 "(1) All powers of the fiscal overseer and budget commission under §§ 45-9-2 and 45-9-6. Such powers shall remain through the period of any receivership;
 "(2) [t]he power to exercise any function or power of any municipal officer or employee, board, authority, or commission, whether elected or otherwise relating to or impacting the fiscal stability of the city or town including, without limitation, school and zoning matter; and
 "(3) [t]he power to file a petition in the name of the city or town under Chapter 9 of Title 11 of the United States Code, and to act on the city's or town's behalf in any such proceeding." Sec. 45-9-7.
The Act further provides:
 "(c) Upon appointment of a receiver, the receiver shall have the right to exercise the powers of the elected officials under the [G]eneral [L]aws, special laws and the city or town charter and ordinances relating to or impacting the fiscal stability of the city or town . . . provided, further, that the powers of the receiver shall be superior to and supersede the powers of the elected officials of the city or town shall continue in accordance with the city or town charter, and shall serve in an advisory capacity to the receiver." Id.
[23] The Court notes that the finance and administration officer is appointed by and reports to the municipality's chief executive officer. See § 45-9-10.
[24] The Court notes that a prior draft of the legislation provided for the removal of elected officials; however, the House Finance Committee insisted on an amendment requiring that no elected official would be removed from office. (Receiver's Reply to Supplemental Mem. in Supp. of Moreau, City Council, and Benson's Mot. for Injunctive Relief 4.)
[25] The Mayor and City Council contend that deferring to the Director of Revenue's discretion is not a sufficient safeguard against the risk of arbitrary and capricious administration of the Act. (Mayor and City Council's Post Hearing Mem. 6-7.) However, unless the Court is presented with evidence indicating otherwise, `all reasonable presumptions must be indulged in support of the action of the officers to whom the law entrusted' enforcement.Gardner v. Cumberland Town Council,826 A.2d 972, 979 (R.I. 2003) (quoting Ross v. Stewart,227 U.S. 530, 535, 33 S. Ct. 345, 348 (1913)); Signore v. ZoningBd. of Review of Barrington (R.I. 1964) (noting that until proven otherwise, sworn officials are entitled to the presumption that their official acts have been properly performed); seealso 29 Am. Jur. 2d Evidence § 220 (2010) (stating that if the constitutionality of a state statute is challenged, absent some showing to the contrary, courts presume public officers charged with enforcement will fulfill their duties to uphold the validity of the statute). Consequently, the Court recognizes that the Director of Revenue, as an agent of the Executive Branch, is entitled to the presumption that she will act in good faith and discharge her obligations in accordance with her oath of office. Opinion to theGovernor, 95 R.I. 109, 118, 185 A.2d 111, 122 (R.I. 1962) (stating that the Court must recognize that coordinate branches of government are entitled to the presumption that they are discharging their obligations in good faith and in accordance with their oath to support and preserve the Constitution). As a result of the presumption, the Court finds that deferring to the Director of Revenue's discretion is a safeguard against arbitrary and capricious administration and ensures that the receivership will last "no longer than [it is] needed." Sec. 45-9-10.
[26] Although under § 45-9-7 the Director of Revenue has the discretion to remove the Receiver or terminate the receivership, her discretion is guided and limited by the goal of preserving the fiscal well-being, public safety, and welfare of cities and towns, as well as protecting the state and municipalities' access to capital markets. See §§ 45-9-1 and 45-9-7.
[27] In the instant matter, the Receiver was appointed after the Director of Revenue, in consultation with the Auditor General, determined that Central Falls faced a fiscal emergency that did not allow for the appointment of a fiscal overseer or budget commission.See Joint Ex. J.
[28] The Court notes that although the Act restricts the Court's jurisdiction with regard to municipal receiverships, the Judiciary is an appropriate forum to challenge the Director of Revenue's enforcement and administration of her duties under the Act, and serves as an additional remedy and safeguard.
[29] The Mayor and City Council also contend that the Act violates the right of suffrage as guaranteed by Article 2, Section 1 of the Rhode Island Constitution. (Mayor and City Council's Mem. of Law in Supp. of its Mot. for a Prelim. Inj. and TRO 14.) They claim that by allowing the Receiver to assume the powers of elected officials, the Act "negates the people's electoral choice." Id. at 15. However, in light of the fact that § 45-9-7(c) specifically provides for elections to continue during the receivership, and the Court's determination that the Act applies alike, affects issues of statewide concern, and does not alter a municipality's form of government, the Court finds that the Act does not violate the right of suffrage guaranteed by Article 2, Section 1.
[30] The Court notes that Pfeiffer, a retired Justice of the Superior Court, previously served as the Director of Business Regulation for the State of Rhode Island.
[31] See supra note 28.
[32] The Court notes that despite Central Falls' receivership, the City Council continues to meet regularly and pass resolutions.
[33] The Mayor and City Council's reliance on Cleveland Bd. ofEduc. v. Loudermill, 470 U.S. 532, 105 S. Ct. 1487 (1985),Board of Regents v. Roth, 408 U.S. 564, 92 S. Ct. 2701 (1972), and Memphis Light, Gas and Water Div. v. Craft,436 U.S. 1, 98 S. Ct. 1554 (1978), is misplaced, as they do not deal with the removal of an elected public official.
[34] To assist the Receiver in resolving a municipality's dire fiscal crisis, § 45-9-7(b)(1) grants the Receiver all of the powers of the fiscal overseer and budget commission.See § 45-9-7(b)(1). As part of those powers, the Receiver is authorized to "[e]xercise all powers under the [G]eneral [L]aws and this chapter or any special act, any charter provision or ordinance that any elected official of the city or town may exercise, acting separately or jointly. . . ." Sec. 45-9-6(d)(20). Furthermore, the Receiver is granted the right to
 "[r]eorganize, consolidate or abolish departments, commission, authorities, boards, offices or functions of the city or town . . . establish such new departments, commissions, authorities, boards, offices or functions as it deems necessary . . . transfer the duties, powers, functions and appropriations of one department, commission, board, office or other unit to another . . . and in connection therewith remove and appointment new members [who] shall serve the remainder of any unexpired term of their predecessor." Sec. 45-9-6(d)(11). Additionally, the Receiver may, in consultation with the Director of Revenue, appoint "persons to fill vacancies on any authority, board, committee, department or office." Sec. 45-9-6(d)(12).
[35] In accordance with § 45-9-7(c), any powers assumed and exercised by the Receiver under § 45-9-7(b) are superior to and supersede those of the elected officials of the city or town, who continue to serve merely in an advisory capacity for the duration of the receivership. See § 45-9-7(c).
[36] The Court's reading of the statute's plain meaning is supported not only by the "Declaration of Policy and Legal Standards," which does not limit the Act to fiscal stability, but also avoids the absurd result of the Receiver being deemed to have less power than the budget commission.See Oct. 5, 2010 Tr. 63; State v. Burke,811 A.2d 1158, 1167 (R.I. 2002) (stating that courts should not construe a statute to reach an absurd result). The Court agrees with the Receiver that if the Receiver's powers are limited to instances relating to or impacting the fiscal stability of a city or town, the budget commission, which does not have a fiscal impact limitation, would have more power than the Receiver. Such a result would be incongruous with the legislative intent clearly evinced by the five-tier mechanism and the increased powers delegated at each tier to the fiscal overseer, budget commission, and receiver.Id. The Court again notes however, that any action taken by the Receiver or other official administering the Act, must be made in accordance with the standards and policy guidelines of the "Declaration of Policy and Legal Standards" of § 45-9-1.
[37] The parties do not dispute that Edna Poulin was subsequently qualified as a commissioner of the CFHA by the filing of a certificate with the City's Clerk and by the administration of the oath of office. (Joint Statement of Undisputed Facts ¶ 25.)
[38] Because § 45-9-7 authorizes the Receiver to assume the powers of the City Council, Pfeiffer's actions also satisfied the requirements of Title 45, Chapter 26 of the General Laws. Under Chapter 46, which governs town housing authorities, the appointment of commission members to the CFHA must be approved by a majority vote of the City Council. G.L. 1956 § 45-26-4. Therefore, because the Receiver had the right to exercise the powers of the City Council, his appointment of Edna Poulin to the CFHA was proper. Furthermore, even under Central Falls' Home Rule Charter, Pfeiffer's actions were valid and proper. Article 3, Section 3-202 provides that "[e]xcept as expressly otherwise provided and subject to the limitations of this Charter, the [M]ayor, with the approval of a majority of the members of the council, shall appoint the members of all boards and commission." Central Falls Home Rule Charter, art. III, § 3-202 (1951). Because the provisions of § 45-9-7 clearly authorized the Receiver to assume the powers of both the Mayor and City Council, under Central Falls' Home Rule Charter, the Receiver had the right and authority to appoint Edna Poulin to the CFHA.
[39] Section 45-9-1 provides that
 "[i]t shall be the policy of the state to provide a mechanism for the state to work with cities and towns undergoing financial distress that threatens the fiscal well-being, public safety and welfare of such cities and town, or other cities and towns or the state, with the state providing varying levels of support and control depending on the circumstances." Sec. 45-9-1.
In enforcing this policy, the Receiver, or any official administering the Act, is required to act to preserve the safety, welfare, and property of the citizens of Rhode Island. Although, the Receiver's appointment of Edna Poulin to the CFHA may appear to be a matter of local concern, the actions of the CFHA and its commissioners have an effect on the safety, welfare, and property of the citizens of Rhode Island. The United States Supreme Court has stated "that even though the evils of bad housing are local in their origin, their effect may become so widespread as to create a menace to the national welfare and that Congress is empowered to deal with the subject in that aspect." City of Cleveland v.United States, 323 U.S. 329, 331, 65 S. Ct. 280, 281 (1945). Therefore, the Court finds that if the evils of bad housing have been held to have a nationwide effect, then it follows that they certainly have a statewide effect. See § 45-25-2 (stating that bad housing conditions in Rhode Island can "cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals, and welfare of the citizens of the state andimpair economic values) (emphasis added). As a result, when the Receiver appointed Edna Poulin to the CFHA he was acting within the scope of the Act and addressing a matter of statewide concern.
[40] Similarly, as part of the powers assumed under the Act, during the receivership, the Receiver has the exclusive right to make appointments to the Board of Directors of the Central Falls Detention Center Corporation. Section 45-54-5(a) provides that "the elected chief executive officer, in cities and towns having a popularly elected chief executive officer, shall appoint five (5) resident electors of the city or town as directors of the corporation" whose appointment is subject to approval by the city or town council. G.L. 1956 § 45-54-5(a). Additionally, the Mayor, as chief executive officer, is authorized to fill vacancies for any unexpired term. See § 45-54-5(b). Thus, the Receiver, upon assuming the powers of the Mayor and City Council has the right to make these appointments. Consequently, given the scope of the Receiver's powers to protect the fiscal well-being, public safety, and welfare of Central Falls under § 45-9-7, his additional powers of appointment and removal under § 45-9-6, and in light of the Mayor and City Council's advisory capacity under § 45-9-7(c), any putative appointments made by the Mayor or City Council are improper and invalid.